No. 76,807

STATE OF KANSAS, *Appellee*, v. LYLE CRAIG SANDERS, *Appellant*.
(949 P.2d 1084)

Opinion filed December 12, 1997.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Charles R. Reimer*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Lyle Craig Sanders appeals his jury convictions and sentences from his second trial for first-degree murder (K.S.A. 1992 Supp. 21-3401) and an aggravated weapons violation (K.S.A. 21-4202 [Ensley 1988]). We reversed Sanders' prior convictions on these charges stemming from the 1993 killing of Latonya Edmond in *State v. Sanders*, 258 Kan. 409, 904 P.2d 951 (1995), on the ground the trial court erred in failing to instruct on the lesser included charge of second-degree murder.

In this appeal, Sanders raises five issues: (1) Did the trial court abuse its discretion in refusing to allow Sanders to cross-examine the detective who interviewed him regarding the detective's resignation from the police force and successful diversion of a theft charge? (2) Did the trial court err in refusing to grant a mistrial after a State witness made an unsolicited comment regarding Sanders' assertion of his right to silence during his police interrogation? (3) Did the trial court abuse its discretion in finding Sanders had failed to prove purposeful discrimination on the part of the State

in the use of its peremptory strikes during jury selection? (4) Was the imposition of three consecutive life sentences pursuant to the Habitual Criminal Act an illegal sentence? (5) Was there sufficient evidence for the jury to convict Sanders of the aggravated weapons violation?

The issues to be decided in this appeal do not necessitate a recitation of all the facts, which are substantially set forth in 258 Kan. at 410-13. Additional facts will be referred to as necessary during our discussion of the issues.

### Use of diversion agreement for impeachment

At trial, the State moved in limine to prevent Sanders from questioning Wichita police detective Randy Lawson about his resignation from the police force and his successful diversion of a theft charge. The court ruled a diversion was not a conviction and thus was not proper impeachment and prohibited Sanders from inquiring as to why Lawson no longer worked for the Wichita Police Department.

In raising this issue, Sanders first emphasizes that the credibility of Lawson was crucial to the State's case. Lawson was the detective in charge of Edmond's murder investigation and had testified that Sanders told him during an interrogation that he had gone to Edmond's house around the time of the murder.

Insofar as the alleged error is the ruling on the State's motion in limine, we apply the abuse of discretion standard of review. *State v. Bornholdt*, 261 Kan. 644, 659, 932 P.2d 964 (1997). Further, we have said the admission or exclusion of evidence, subject to exclusionary rules, is within the trial court's discretion. *State v. Baacke*, 261 Kan. 422, 427, 932 P.2d 396 (1997). A trial court may only be said to have abused its discretion when its action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the view of the trial court.

K.S.A. 60-420 provides:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

K.S.A. 60-421 limits evidence of a conviction of a crime in order to impeach a witness' credibility. It reads, in relevant part: "Evidence of the conviction of a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his or her credibility."

Further limitations upon the admissibility of evidence affecting credibility are set forth in K.S.A. 60-422:

"As affecting the credibility of a witness . . . (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

In the present case, Sanders acknowledged evidence of the diversion for theft was evidence of a prior bad act, not a conviction. He may not now assert on appeal that the diversion was a *conviction* of a crime involving dishonesty such that 60-421 allows its admission, especially as he presents absolutely no argument or authority that a diversion constitutes a conviction for purposes of 60-421. Nor has Sanders presented any credible argument that evidence of this bad act is admissible for any purpose other than to impeach Lawson's character trait of veracity. As such, the evidence must be excluded pursuant to 60-422(d).

The trial court did not err in ruling this evidence was inadmissible to impeach Lawson.

Sanders further contends, however, that the trial court's ruling unconstitutionally denied him his right to confront and cross-examine Lawson, prevented him from presenting his defense, and precluded him from receiving a fair trial.

In *Bornholdt,* we noted:

" 'The Confrontation Clause of the Sixth Amendment affords the accused the right to cross-examination. [Citation omitted.] A proper and important function of the right to cross-examination is the exposure of the witness' motivation in testifying. [Citation omitted.] Generally, the right to cross-examine witnesses is subject to evidentiary rules, and the trial court has broad discretion in controlling the examination. [Citation omitted.]

" 'Error in restriction of cross-examination is subject to a harmless error standard if the reviewing court can declare beyond a reasonable doubt that the error had little if any likelihood of changing the result of the trial. [Citation omitted.] However, there are certain circumstances in which the denial of effective cross-

examination amounts to a constitutional error of such magnitude that no showing of prejudice is required for reversal. [Citation omitted.]' " 261 Kan. at 654 (quoting *State v. Rinck,* 256 Kan. 848, 854, 888 P.2d 845 [1995]).

Sanders has failed to show the evidence he sought to cross-examine Lawson about had any bearing upon Lawson's motivation for testifying in this case. Sanders simply wanted to use this evidence to attack Lawson's credibility, thereby impeaching his testimony. Restricting such cross-examination in no way deprived Sanders of his constitutional right to confront witnesses. As no error, constitutional or otherwise, was committed in the exclusion of these questions pursuant to our rules of evidence, this issue fails.

### Right to remain silent

Sanders next claims the State improperly admitted his invocation of his Fifth Amendment right to silence during the direct examination of Lawson. He argues this reference was so prejudicial as to amount to reversible error.

On the day Edmond's body was discovered, Sanders contacted the police and agreed to come to the station to talk. Sanders was *Mirandized,* told he was not in custody, and informed he was free to leave at any time.

Lawson and another officer interviewed Sanders for a little over an hour. A break was taken, and shortly after the interview resumed Sanders stated, "I'm not saying nothing else until I get me a lawyer."

Prior to the first trial, Sanders moved to prohibit the State from questioning the officers regarding Sanders' decision to terminate the interview and speak to an attorney. The court in the first trial granted this motion and instructed the State to direct Lawson not to volunteer that information. However, the court ruled that Lawson could describe Sanders' demeanor while he was questioned. Rulings on the motions from the first trial were carried over to the second trial by agreement of the parties.

The testimony to which Sanders objects occurred during Lawson's description of his interview with Sanders. The transcript reads as follows:

"Q. And why did you show him these items?

"A. Because there was a spot that appeared on one of the clothing, the pants, that appeared to be a bloodstain.
"Q. And when you saw that—let me ask you this: Did you tell him that?
"A. Yeah. I took the clothing in to him and asked him, and I told him that this looked to me—looked to be a bloodstain and asked him what it was.
"Q. What did he tell you?
"A. His whole demeanor changed. He became upset, told us he didn't want to talk to us anymore.
"Q. Did he tell you anything about blood?
"MR. LOEFFLER: Your Honor, I'm going to object. May we approach?"

At the bench, the prosecutor immediately noted: "I directed Lawson not to say anything about terminating the interview. What I was getting at was what did he say about the blood on the clothes. It was my understanding he understood that."

Sanders moved for a mistrial based on the fact that Lawson's statement was a clear violation of the motion in limine, as Lawson had mentioned Sanders' invocation of his right against self-incrimination. The court denied Sanders' motion, stating:

"What he said was, he told us he didn't want to talk to us anymore. That can be taken a number of ways. He just—he didn't say, I want—I'm exercising my Fifth Amendment rights; I want a lawyer. He didn't say anything like that. That's not what Mr. Lawson said from the witness stand."

Sanders did not ask the court to strike the testimony or request a limiting instruction.

We addressed an almost identical issue in *State v. Rice,* 261 Kan. 567, 591, 932 P.2d 981 (1997). In *Rice,* we set forth our standard of review:

"The trial court may declare a mistrial when prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. K.S.A. 22-3423(1)(c). The decision to declare a mistrial lies within the sound discretion of the trial court and will not be reversed absent a clear showing of abuse of that discretion." 261 Kan. at 592.

We have further held that in order to show the trial court abused its discretion in failing to grant a mistrial, the party seeking the mistrial has the burden of showing the party was substantially prejudiced by the error. *State v. McClanahan,* 259 Kan. 86, 92, 910 P.2d 193 (1996).

In *Rice*, we held the trial court had not abused its discretion by refusing to grant a mistrial after a witness had improperly mentioned Rice's invocation of his Fifth Amendment rights. As our authority, we relied on *State v. Barncord*, 240 Kan. 35, Syl. ¶ 5, 726 P.2d 1322 (1986), and *State v. Mitchell*, 220 Kan. 700, 703, 556 P.2d 874 (1976), which focused the inquiry upon whether a limiting instruction was given, the degree of prejudice, and whether the erroneous admission of evidence was of such a nature as to affect the outcome of the trial.

Although possibly improper, Lawson merely remarked that Sanders had said he did not want to talk to them anymore. As the trial court pointed out, Lawson did not state that Sanders pled the Fifth Amendment or asked to speak to a lawyer. Additionally, the State immediately proceeded to ask another question regarding another subject before Sanders' counsel even lodged an objection. Furthermore, the State presented ample evidence to convict Sanders, including his own statements, the DNA evidence from the bloodstains, and his hat discovered at the crime scene. Sanders has failed to sustain his burden of proving he was prejudiced by Lawson's remark so as to require reversal.

The issue here is whether a mistrial should have been granted, and we hold the trial court did not abuse its discretion in refusing to do so.

*Batson challenges*

Sanders, an African-American, claims the State's use of three of its peremptory challenges to strike minorities from the venire amounted to racial discrimination in violation of the 14th Amendment Equal Protection Clause of the United States Constitution and *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

Although the trial court did not specifically find Sanders had presented a prima facie case of racial discrimination and this issue might be handled as we did in *State v. Sledd*, 250 Kan. 15, 825 P.2d 114, *cert. denied* 506 U.S. 849 (1992), the court impliedly so found and clearly wanted to ensure a clear record was made concerning the exercise of the State's peremptory strikes. When the

State struck the minority members from the panel, Sanders requested race-neutral reasons, and the court permitted the State to explain its reasons for striking the jurors. The following day, additional argument was entertained regarding the challenged strikes.

The manner in which we review a *Batson* challenge was recently set forth in *State v. Vargas*, 260 Kan. 791, 794-95, 926 P.2d 223 (1996), where we said:

"In reviewing a *Batson* violation concerning the State's use of a peremptory challenge, the applicable appellate standard of review is whether the trial court abused its discretion in determining if the challenged strikes were constitutionally permissible. *State v. Walston*, 256 Kan. 372, 373-74, 886 P.2d 349 (1994). Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner, or in other words, when no reasonable person would take the view adopted by the trial court. *Walston*, 256 Kan. at 374 (citing *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 [1991]).

"The *Batson* analysis involves a three-step process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Batson*, 476 U.S. at 96-97. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. 476 U.S. at 97-98. Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. 476 U.S. at 98.

"The Supreme Court recently elaborated upon this analysis in *Purkett v. Elem*, 514 U.S. 765, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995). The *Purkett* court agreed that the *Batson* analysis is a three-step test.

"The *Purkett* court observed that the second step of the *Batson* process does not demand an explanation that is persuasive, or even plausible, but requires merely facial validity of the prosecutor's explanation. It determined further that unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. It concluded that the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. *Purkett*, 131 L. Ed. 2d at 839."

The first minority member the State struck was M.C., a Native American woman. The prosecutor declared she had already decided to strike M.C. before the prospective juror had announced she was Native American. Recalling that M.C. had indicated she would have trouble trusting people and had exhibited marked religious beliefs, the prosecutor stated in her experience "those of high religious beliefs have trouble judging people." The prosecutor added, "She said she can't judge other people; she has trouble

doing that." Later, the prosecutor set forth for the record that M.C. had indicated that she could not hold the State to its standard and that she may hold the State to a higher standard.

The next minority member the State struck from the panel was E.B., an African American woman. The prosecutor explained that she was also striking E.B. due to her deep-seated religious beliefs, especially as she had said "Amen" following M.C.'s response that only God could judge people. The prosecutor pointed out that E.B. kept shaking her head with displeasure while defense counsel questioned the panel about having trouble with blacks. The prosecutor related that E.B. indicated she would have difficulty finding guilt without the murder weapon and that E.B. nodded in agreement when defense counsel spoke about the defendant not having to testify. Remarking that E.B. reminded her of her mother, the prosecutor added that her mother would be a horrible juror for the State. The prosecutor was further concerned with E.B.'s age, declaring that older women tend to have difficulty judging people.

The State also struck the only remaining African-American on the panel, M.B. The prosecutor pointed out that M.B. was a teacher and that "teachers sometimes tend to be very sympathetic and do not make good State jurors." She also mentioned that M.B. had "hemmed and hawed" when questioned about the handling of evidence in the O.J. Simpson trial. The next day, the prosecutor added that M.B. had mentioned problems with her job, as two other teachers were out sick.

The next day, when further justifying her strikes of M.C. and E.B., the prosecutor stated:

"As to [E.B.], who was the other black woman on the panel, she is an older lady. I told the Court yesterday that I generally tend to strike older women because I think they're very sympathetic to the defense and don't look at the hard facts. I indicated to the judge that she reminded me very much of my mother, a very religious person; and it's been my experience when I run cases by my mom, she always votes for the other side. And it's been my experience in 15 years of trying cases that elderly women are often very sympathetic and often have a hard time making decisions in a case like this.

"I had Ms. [L.] on my list to strike for the very same reason, except defense got to her first. When—[M.C.], the American Indian woman—who was also an older lady and who didn't want to be here; she wanted to be with her grandchil-

dren—she said she trusted people way too much. She made a comment that only one person can judge, and that's God. [E.B.] went, Amen, which is fine; I think that's great. But that's one reason I struck her. Her skin color had absolutely nothing to do with it."

In ruling the State had presented race-neutral reasons for the strikes, the trial court noted that out of 60 people brought in to compose the venire panels, only 8 were members of minority groups. She indicated there were four African-Americans, one Vietnamese, one Hispanic, one Native American, and one of Lebanese origin. Of the four African-Americans, one did not make it onto a panel through random selection, and another was placed on the panel from which alternate jurors were chosen. Thus, out of the 36 people in the venire from which the jurors were selected, only 2 were African-Americans. Both were struck by the State. The State did not strike the African-American woman on the alternate panel. Of all the minority members, only the Lebanese man served on the jury.

The trial court further and specifically stated:

"And I want to point out that the reasons for striking [M.C.] and Mr. [N.] were patently obvious and obviously valid, and I find absolutely nothing that was a problem with them. . . .

. . . .

". . . I want to point out that of those two [the African-Americans], . . . when [M.C.] made the comment about God was the judge of people, et cetera, or whatever the exact words she used, and [E.B.] said, Amen, I believed at that time that she was—would be struck. I believed at that time actually that both of them would be struck. It was a clear indication of some very strong feelings one way.

. . . .

"As to [M.B.], regarding the fact that she is a teacher, Ms. Furst has made what I believe to be a clearly adequate record regarding her reason for striking [M.B.]. She is a teacher, and I will point out that when I was in the DA's office, I struck just about every teacher on the panel as well."

In maintaining that the striking of M.C., E.B., and M.B. was racially motivated, Sanders claims the record indicates M.C. could have made a decision in the case. However, a reading of the cited record clearly indicates hesitation on the part of M.C. to judge a person, as well as a reluctance to apply the proper burden of proof, both of which qualify as race-neutral reasons for excluding a juror.

The court's determination that the strike of M.C. was patently obvious is not an abuse of discretion.

Next, Sanders asserts the State's antagonism towards persons of strong religious beliefs was not consistently applied. However, the State also struck two other jurors for this exact reason, and Sanders has failed to point out any other panel members that strongly exhibited this characteristic whom the State did not strike. The fact that E.B. responded "Amen" following statements that God is the only judge indicates her religious temperament and possible inability to pass judgment. Again, no abuse of discretion can be found in the trial court's determination that E.B. was stricken for race-neutral reasons.

Finally, Sanders argues the strike of M.B. on the grounds she was a teacher masked a discriminatory purpose because the State failed to strike a white teacher from the venire. When it struck M.B., the State pointed out that it had previously struck a white teacher for the same reason it struck M.B. When Sanders complained the State did not strike the remaining teacher from the panel, Ms. R., the State replied, "The difference in this one is that Ms. [R.]'s sister was the victim of an armed robbery and that case went to trial and so she has an idea of how victims feel. I·feel she would be sympathetic to our dead victim, who nobody has to speak for."

In deciding whether the strike of M.B. was racially motivated, the court declared:

"I do want to point out that her explanation for the reason that she left Ms. [R.] on the jury panel was a reasonable and valid exception for not striking her, whereas her tendency was to strike teachers.

"Ms. [R.] was very clear that her sister had been the victim of a crime. There were a number of things in her comments that made it appear that the tendency to strike her as a teacher was overcome by other answers that she gave which might make Ms. Furst believe that she would be a good juror from the State's perspective."

The reason for striking one teacher and not the other was clearly race neutral. In so finding, the trial court did not abuse its discretion.

Sanders additionally argues a matter pertaining to the one remaining minority member of the venire who was left to serve on the jury. His claim is unsupported in the record, and the issue was not raised before the trial court. "An issue not presented to the trial court will not be considered for the first time on appeal." *State v. Alderson*, 260 Kan. 445, Syl. ¶ 7, 922 P.2d 435 (1996).

Sanders' challenge to the composition of the jury panel fails.

### Consecutive life sentences

Sanders was sentenced to three consecutive life terms for his conviction of first-degree murder pursuant to K.S.A. 21-4501(a) and 21-4504(b). Sanders now argues this sentence is illegal because its only purpose is to push back his parole eligibility date.

We relied on *State v. Beasley*, 205 Kan. 253, 469 P.2d 453 (1970), *cert. denied* 401 U.S. 919 (1971), in upholding the enhancement of a life sentence pursuant to K.S.A. 21-4504 in *State v. Baker*, 237 Kan. 54, 56-57, 697 P.2d 1267 (1985). We also dismissed a similar argument regarding the alleged illegality of enhancing a sentence to postpone parole eligibility in *State v. Evans*, 251 Kan. 132, 141, 834 P.2d 335 (1992). Sanders has presented no compelling argument to convince us these cases were wrongly decided.

### Aggravated weapons violation

Sanders contends no evidence was introduced at trial that would indicate the type or size of instrument used to murder Edmond, other than that the edge may have been serrated. Thus, he asserts the State failed to prove the element of possessing a dangerous knife, as required to establish an aggravated weapons violation contrary to K.S.A. 21-4202 (Ensley 1988).

When the sufficiency of the evidence is challenged in a criminal case, our standard of review is whether, after a review of all of the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found defendant guilty beyond a reasonable doubt. *State v. Bowen*, 262 Kan. 705, 942 P.2d 7 (1997).

When the crime was committed, K.S.A. 21-4202 (Ensley 1988) provided that an aggravated weapons violation was a violation of the provisions of K.S.A. 21-4201 (Ensley 1988) by a person who had been convicted or released from imprisonment for a felony within the preceding 5 years. K.S.A. 21-4201(b) (Ensley 1988) prohibited the possession, with intent to unlawfully use against another, of any dangerous knife or other deadly weapon or instrument. This section also stated that "an ordinary pocket knife with no blade more than four inches in length shall not be construed to be a dangerous knife, or a dangerous or deadly weapon or instrument." Language very similar to this was included in the jury instruction which set forth the elements of an aggravated weapons violation.

The evidence clearly showed Sanders had been convicted or released from imprisonment for a felony within the preceding 5 years.

In the present case, Edmond's body was found beaten and strangled, and her throat had been cut numerous times. No weapon was discovered. In the kitchen, a drawer had been left open which contained kitchen utensils, including knives.

Dr. Jill Gould, the forensic pathologist in the case testified the wounds on Edmond's neck exhibited "numerous small, irregular but regularly-placed abrasions. This is something that we see that is consistent with the instrument having a serrated edge or a scalloped edge, like a steak knife or something like that, but an instrument that has a sharp, narrow blade with an irregular surface." She also stated on a scale of 1 to 10, she would put the sharpness of the blade at 5, as it was not razor sharp. Dr. Gould indicated, "[W]e don't see a nice, clean cut; we see a jagged cut like a more of a sawing action was used." When asked if a pocketknife could have been used, she replied, "I guess one could have used a pocketknife, but I would think that the blade may have been longer. I don't know." Dr. Gould also testified that a cut on Edmond's face was "consistent with an injury occurring due to a thin-bladed, sharp object. It could be a knife."

Although the pathologist was unable to state whether an ordinary pocketknife could have caused Edmond's injuries, Sanders' argu-

ment does not take into account the inferences the jury could reasonably have drawn from the evidence presented. As we pointed out in Sanders' prior appeal, recently quoted in *State v. Ordway*, 261 Kan. 776, 804, 934 P.2d 94 (1997), "[i]f an inference is a reasonable one, the jury has the right to make the inference." *Sanders*, 258 Kan. at 414.

Here, it was reasonable for the jury to infer a knife was taken from the kitchen and used in the attack upon Edmond. Such a knife would fit the definition of a dangerous knife and would be consistent with the injuries described by the pathologist. Considering the evidence in the light most favorable to the State, we hold a rational factfinder could have found Sanders guilty beyond a reasonable doubt of an aggravated weapons violation.

Affirmed.

LOCKETT, J., not participating.

RICHARD W. WAHL, Senior Judge, assigned.