No. 79,375

STATE OF KANSAS, *Appellee*, v. ANTAWIN B. LYONS, *Appellant*.
(973 P.2d 794)

Opinion filed January 22, 1999.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*James A. Brown*, assistant district attorney, argued the cause, and *Tony W. Rues*, assistant district attorney, *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by defendant Antawin B. Lyons from his conviction of premeditated first-degree murder. His appeal centers around the trial judge conducting an in camera hearing with a witness and limiting Lyons' cross-examination of William Henderson.

The in camera examination was held outside of the presence of Lyons and counsel for either the State or Lyons, but conducted with their knowledge and consent. The in camera examination was of a witness, Deletha Kelley. If the trial court erred in conducting an in camera examination of Kelley, an issue arises as to whether the in camera examination was harmless error.

The trial judge limited the cross-examination of Henderson concerning the facts of another homicide (the *Mayfield* case). Henderson was a controversial witness because in order to obtain Henderson's testimony, the State refrained from charging him for any role he may have had in this case and also withdrew a warrant for his arrest due to his parole violation in a juvenile case. Henderson also agreed to testify for the State in the *Mayfield* case. The events giving rise to the *Mayfield* case occurred after Henderson had agreed to testify for the State against Lyons and after Henderson provided his testimony against Lyons at the preliminary hearing.

Lyons presented no witnesses and his theory of defense was that someone else committed the murder.

In viewing the facts, the reader should bear in mind that if the trial court erred in holding an in camera examination of Kelley, an issue arises as to whether the error was harmless beyond a reasonable doubt. In order to declare a constitutional error harmless, an appellate court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.

In the early morning hours of August 25, 1996, Bonnie Dexter Adams was shot and killed outside the Jordan Patterson American Legion Post (Legion) in Topeka, Kansas.

Henderson was one of four eyewitnesses to all or part of the shooting death of Dexter. Henderson testified that he went to the Legion about 1:30 a.m. on August 25, 1996, to see if his cousins, Thomas Brown, Jr. (T.J.) and Carl LaNeil Brown (Neil), were there. He had been friends with Lyons for about 1½ years, and about 10 to 15 minutes before the shooting, he had a conversation with Lyons. Henderson testified that during this conversation, Lyons said: "There goes the dude that I shot four times before, and I'm going to kill this motherfucker this time."

Henderson did not know Dexter before the killing, but he had seen the person Lyons intended to kill because Lyons was looking at Dexter while commenting about "the dude" that he was going to kill. Henderson said that because he believed Lyons was serious about his threat to kill Dexter, he decided to leave the Legion. While he was walking to his car, he spoke with three women and agreed to give them a ride home. T.J. met him at his car and sat in the driver's seat of Henderson's vehicle. As the three women were getting into the car, Henderson heard a gunshot from behind him. When he turned toward the direction of the gunshot, he saw "Dexter falling to the ground."

Henderson testified that he watched Dexter fall to the ground and saw Lyons moving towards Dexter while shooting him. Henderson stated that he saw "Antawin [Lyons] walk up on him [Dexter] and keep shooting." He also saw Dexter's body moving and jumping while Lyons was shooting. According to Henderson, Lyons had a black gun in his hand and his right hand was outwardly extended in a downward position towards Dexter.

After the gunshots, Henderson stated that everyone in the parking lot was trying to leave. T.J. was driving with one of the women in the front passenger's seat. Henderson climbed in the back seat with the other two women. T.J. drove out of the parking lot to the street where Lyons jumped in the front passenger side of the car. Neil then jumped onto the hood of Henderson's car. Lyons told Neil to shoot at the vehicle behind them "because he didn't want nobody following us." Neil proceeded to shoot, but his bullets hit Henderson's car rather than the car behind them.

The three women riding in Henderson's vehicle jumped out of the vehicle when it slowed down near 17th and Hudson Streets. Neil then got in the back seat of the car with Henderson and they proceeded to the 29th and California area where T.J.'s mother lived. Henderson testified that they stopped a couple of houses away from T.J.'s mother's house. Lyons told him to hide the guns and to wipe any fingerprints from the guns. Henderson took the guns from Lyons and Neil. He did not know what happened to T.J's gun which was a Mac-11. T.J. and Lyons got out of the car at 29th and California, and Henderson and Neil went to Henderson's

parents' house. Henderson hid the black .45 and the chrome 9mm under the floor of a porch-type area off of the kitchen.

Tawanna Augustine testified that she had driven herself and Kelley to the Legion on the night of the shooting. They arrived about 12:30 a.m. and sat in their car talking with a few people in the parking lot for about 10 to 15 minutes, before entering the Legion. Augustine testified that she did not know Lyons personally, but she knew him well enough to extend a greeting to him when she saw him. She stated that she knew Lyons by sight because at one time they had been in school together and since then she had seen him "here and there."

After the Legion closed, Augustine and Kelley sat and talked together in the car for about 15 minutes before the shooting. Augustine testified that she saw Lyons and his friends lining up against the outside wall of the Legion, but she did not notice that any of them had a weapon. When Augustine heard the first gunshot, she turned around and saw Dexter lying on the ground about 6 to 12 feet away from her car and saw Lyons standing over Dexter shooting him.

Augustine also saw Lyons fire another shot and saw Dexter flinch in conjunction with this shot. She did not remember seeing anyone else in the immediate area of the shooting, except for Dexter and Lyons. Augustine was very clear in her testimony when she stated that it was Lyons who had shot Dexter.

Kelley, the witness who was examined in camera by the trial judge, testified that before entering the Legion on the night of the shooting, she saw Lyons leaning up against the outside wall with a black gun in the side of his pants. After the Legion closed, Kelley and Augustine sat in the car in the parking lot. The women started to leave but Kelley heard gunshots while the car was stopped and looked to her left. When the prosecutor asked Kelley whom she had seen in the area of the gunshots, she stated, "Antawin, I believe. I'm not really for sure, but that's what I believe."

The prosecutor then asked Kelley whether she remembered the testimony she had given in an interview with law enforcement officers and at the preliminary hearing. She responded that when asked at the interview and the preliminary hearing whom she had

seen in the area of the gunshots, she had stated that "it was An-
tawin." The prosecutor asked her why her testimony had changed
from positively identifying Lyons as the person who she had seen
shoot Dexter to her present testimony that she really was not sure
but that she believed it was Lyons who shot Dexter. Kelley re-
sponded, "Because I didn't really see him. I thought that that's
who I saw, and somebody had told me that that's who it was. So
that's what I assumed." When the prosecution attempted to ques-
tion Kelley about why she did not like testifying, defense counsel
asked to approach. A short, off-the-record discussion was held at
the bench, and the court subsequently declared a recess.

Outside of the jury's presence, the prosecution again asked Kel-
ley whether she remembered testifying under oath at the prelim-
inary hearing regarding whom she thought appeared to shoot
someone, and she answered that she had said it was "Antawin Ly-
ons." The prosecutor asked her, "And, today, you're saying you
don't think it was Antawin Lyons?" She responded, "I said that—
well, that may have been what I said, but that's—can I explain?"

At that point defense counsel interjected, "I move that we ap-
point counsel to her, Judge." The prosecution replied, "No." The
court then asked: "Well, counsel, do you mind if the Court con-
ducts an in camera questioning of the witness?" Defense counsel
responded, "Not at all, Judge." The judge explained that the ques-
tioning was only "for the purpose of making a determination of
whether counsel needs to be appointed." Defense counsel again
approved of such action, stating, "I agree, Judge. And we can seal
the record so in case there is a problem." At that point an in camera
hearing was held by the trial judge. Present were the court reporter
and Kelley.

Upon reconvening, after a determination by the trial judge that
Kelley did not need counsel appointed, the prosecution asked her,
"[W]ho was the person, when you looked to the left, that was in
that immediate area where you heard gunshots?" Kelley re-
sponded, "Antawin Lyons". The court permitted the prosecution
to question Kelley regarding why she had definitively testified at
the preliminary hearing that it *was* Lyons whom she had seen
shooting, but on the day of the trial she had changed her response

that she *believed* it was Lyons. Kelley essentially replied that she had changed her unequivocal statement to an ambiguous one because she was afraid of what people would say or think about the fact that she was testifying.

Colwin Henderson had no criminal history and was not receiving anything from the State in exchange for testifying. Colwin went to the Legion about midnight on the night of the shooting, but never went inside because he was underage. Upon arriving at the Legion, he simply walked around the parking lot and talked to people. Specifically, he remembered talking to Lyons, T.J., who is his cousin, and a few other people. Colwin testified that he had known Lyons for 6 or 7 years and that they were friends.

Neil and Henderson are also Colwin's cousins, and Colwin stated that he was good friends with them. Colwin admitted that he was reluctant to testify at the trial. The prosecution noted that Colwin was supposed to have appeared to testify the day before but failed to appear. That evening, after he failed to appear in court to testify, police officers visited his house and told him that he would be arrested if he did not appear to testify the following day.

Colwin stated that he did not know Dexter personally, but he had met him. He explained that he and Dexter were neither friends nor enemies. When Colwin heard gunshots, he fell to the ground and then looked around to determine the origination of the shots. When he looked behind, he saw "Antawin shooting Dexter." He also testified that he saw Lyons with a gun, Dexter lying on the ground, and one of Lyons' arms extended towards Dexter. Colwin also said that he saw no one else in the immediate area of the shooting except for Lyons and Dexter.

Dr. Thomas, the Shawnee County coroner, testified that Dexter had died from "multiple gunshot wounds to the head." Dexter also had four gunshot wounds to the pelvis area. Dr. Thomas stated that the bullets recovered from Dexter's head and body were consistent with bullets fired from a relatively large caliber gun, such as a .45 caliber.

David Smith, a Topeka police officer assigned to the Crime Scene Unit, responded to the scene of the homicide at 2:43 a.m. on August 25, 1996. Smith found 10 .45 caliber shell casings near

Dexter's body. Smith also collected eight 9mm shell casings along a street near the Legion.

Detective Thomas Hren executed a search warrant at Henderson's parents' home in the afternoon of August 26, 1996. There were six bullet holes in the roof of Henderson's car. Hren found a Heckler and Koch .45 caliber pistol and a Beretta 9mm pistol in a crawl space, accessed by a trap door in the pantry.

The jury found Lyons guilty of murder in the first degree. Lyons was sentenced to life imprisonment (25 years without parole) on May 9, 1997. Lyons timely appealed. This court has jurisdiction pursuant to K.S.A. 22-3601(b)(1).

## I. IN CAMERA EXAMINATION

Lyons failed to make a contemporaneous objection to the in camera questioning of the witness at the trial level. Under K.S.A. 60-404:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

Kelley was testifying when the following discussion transpired:

"Q. (by Mr. Rues) Okay. Do you remember who you told who you thought appeared to be shooting someone?

"A. (by Kelley) Yes.

"Q. And who was that?

"A. Antawin Lyons.

"Q. Okay. And, today, you're saying you don't think it was Antawin Lyons?

"A. That's not what I said.

"Q. Well, what did you say, Miss Kelley?

"A. I said that — well, that may have been what I said, but that's — can I explain?

"Mr. Ambrosio: I move that we appoint counsel to her, Judge.

"Mr. Rues: No.

"A. No, just let me —

"Mr. Ambrosio: I can do that Tony [Rues].

"A. Just let me explain what my thought is.

"The Court: Well, counsel, do you mind if the Court conducts an in-camera questioning of the witness?

"Mr. Ambrosio: Not at all, Judge.

"The Court: Just for the purpose of making a determination of whether counsel needs to be appointed.

"Mr. Ambrosio: I agree, Judge. And we can seal that record so in case there is a problem.

"The Court: Okay. Mr. Cuevas [the court reporter] and I and the witness will go in the conference room."

Thus, the question becomes whether the issue should be decided on the merits, despite the lack of a contemporaneous object at trial. "An issue not presented to the trial court will not be considered for the first time on appeal." *State v. Gardner*, 264 Kan. 95, Syl. ¶ 4, 955 P.2d 1199 (1998). Also, in *State v. Boyd*, 257 Kan. 82, 89, 891 P.2d 358 (1995), the court stated that "a timely objection is necessary to give the trial court the opportunity to correct any alleged trial errors. [Citation omitted]."

Lyons not only failed to object, but counsel for Lyons acquiesced in the in camera hearing; thus, the issue for appeal has not been preserved for appeal. However, we believe that the matter deserves at least some comment.

The trial court should be conscious at all times that an accused in a criminal trial has certain constitutional rights that counsel for a defendant cannot waive, although a defendant can waive a constitutional right, and the trial judge must make a record of the waiver. This was not done in this case. However, we hold that even if Lyons had preserved the issue and it fell within a protected right, the error had little, if any, likelihood of having changed the result of the trial. We have previously held:

"Error . . . in violation of a constitutional . . . right of a party is governed by the federal constitutional error rule. An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that the error is harmless. Before an appellate court may declare such an error harmless, the court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. Where the evidence of guilt is of such direct and overwhelming nature that it can be said that evidence erroneously admitted or excluded in violation of a constitutional or statutory right could not have affected the result of the trial, such admission or exclusion is harmless. [Citation omitted.]" *State v. Sanders*, 258 Kan. 409, 418-19, 904 P.2d 951 (1995), *aff'd on appeal after new trial* 263 Kan. 317, 949 P.2d 1084 (1997).

In the present case, we need not again recite the testimony of each witness. Any inconsistency in the testimony of the witnesses pales in comparison to the witnesses' consistent testimony that it was Lyons who shot Dexter. The evidence against Lyons is of the direct and overwhelming nature necessary to hold that the challenged error could not have affected the result of the trial. Even if Kelley's testimony is considered strictly in terms of the testimony that she gave at trial before the in camera questioning (that she *believed* or it *appeared* that it was Lyons who shot Dexter), such testimony by one witness would not have affected the result of the trial, given that three other witnesses positively identified Lyons as the individual who shot Dexter and there is no evidence that anyone else fired the fatal shots.

In conclusion, Lyons has not preserved the issue for appeal and, in any event, Lyons' due process rights were not violated by the challenged error because such error was harmless, based on the record before us.

The judge did not elicit new information from Kelley during the in camera questioning that was not explored by the prosecution or Lyons on cross-examination. Kelley essentially repeated what she had told the judge in camera when she returned to the witness stand. Thus, the jury was able to fully evaluate Kelley's demeanor and her recollection of events during direct and cross-examination.

Lyons had ample opportunity to cross-examine Kelley about her motives, her version of the events, and her change in testimony. The jury had substantial testimony from which it could weigh Kelley's credibility. The judge's questioning did not deny the jury a significant basis upon which it could resolve whether Kelley's testimony was sound, plausible, flimsy, or fraudulent. Thus, Lyons' arguments that the in camera questioning violated his right to confrontation and effective cross-examination and the right to be present all fall within the harmless error rule set forth above.

## II. CROSS-EXAMINATION OF WILLIAM HENDERSON

The judge noted that orders in limine had been entered, "but the Court had reserved ruling upon the question of whether or not the defense could cross-examine Mr. Henderson regarding any ar-

rangements he had made with the State related to charges arising against him from the murder of Gerald Mayfield." The State agreed to charge Henderson with aggravated battery and conspiracy to commit aggravated battery in the *Mayfield* case. In exchange for his testimony in that case, Henderson would receive probation.

The appropriate standard of review is not one of constitutional error, but whether the trial judge abused her discretion in ruling that Lyons could not cross-examine Henderson regarding the specifics of the *Mayfield* case. In *State v. Mims*, 264 Kan. 506, 956 P.2d 1337 (1998), the court stated that "[a]dmission of evidence falls within the trial court's discretion, which is abused only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view." 264 Kan. at 510 (citing *State v. Haddock*, 257 Kan. 964, 978, 897 P.2d 152 (1995).

Defense counsel made an offer of proof regarding his questioning of Henderson and stated that his inquiry would be: "And you're also continuing to aid the State, and you're aiding the State in the matter of the Mayfield homicide, and you were testifying in that case, also, . . . and you're going to get a deal based on your testimony?" The State's objection to allowing the defense to so question Henderson was that although a logical connection existed because Henderson was involved in both homicide cases, the Mayfield homicide occurred after the Dexter homicide. Therefore, the State could not have offered Henderson anything in Lyons' case that related to Mayfield, because Mayfield had not happened when the State made arrangements for Henderson's testimony in Lyons' murder trial.

The judge stated that Henderson's agreement to continue aiding the State could affect his bias. The judge thus ruled that Henderson's involvement in the Mayfield homicide was "something the defendant should be allowed to explore to a limited degree. The problem that I have with the offer of proof you have made is that it flies into 60-455 as to Gerald Mayfield of other bad acts." The judge concluded: "I am willing to allow a question which says, 'And have you had consideration in other matters from the State,' but

not get into the specifics that it was another homicide, or the specifics of that case."

On direct examination, the prosecution questioned Henderson about what he was receiving in exchange for his testimony against Lyons. Henderson testified that the State had agreed not to charge him for hiding the guns and had recalled a warrant for his arrest due to a juvenile probation violation. The State also asked Henderson whether he was involved with another case for which he was receiving consideration from the State, and Henderson responded affirmatively. The following dialogue took place between Henderson and the prosecutor during direct examination:

"Q. (by Mr. Rues) William, this other case, it's a homicide case, right?
"A. (by Henderson) Right.
"Q. You didn't commit the homicide?
"A. Nope.
"Q. You're giving testimony of what you saw, correct?
"A. Correct.
"Q. All right. You're charged with other charges in the homicide?
"A. Correct.
"Q. Aggravated Battery, Conspiracy to Commit Aggravated Battery?
"A. Correct."

Henderson also answered affirmatively to the following question: "Is it your understanding that this testimony you're giving in this other case, not in this one today, but this other case, it happened after you gave an interview in this case with the police and also the preliminary hearing transcript, correct?" Lyons vigorously cross-examined Henderson regarding his statements to the police, his testimony during the preliminary hearing, and his motivation for testifying against Lyons. Lyons exposed that Henderson had failed to mention anything about his involvement with hiding the guns and wiping them down for fingerprints prior to his cross-examination during the preliminary hearing.

In conclusion, Lyons was not denied his right of effective cross-examination because the court disallowed him from delving into the specifics of the Mayfield homicide, which could have presented evidentiary (double jeopardy) problems for that case. Thus, the trial court's action in limiting cross-examination to avoid jeopard-

izing another case was not an abuse of discretion. See *State v. Davidson*, 264 Kan. 44, 56, 954 P.2d 702 (1998).

The defense asserts that the denial of effective cross-examination has been held to amount to a constitutional error of such magnitude that Lyons is not required to show prejudice for reversal. Under the facts of this case, the limitation imposed on Lyons' cross-examination of Henderson does not rise to the level to amount to constitutional error.

In conclusion, Lyons' rights to cross-examination and to present a defense were not impaired by the trial court's ruling that Lyons avoid the specifics of Henderson's involvement and cooperation in the Mayfield homicide during Henderson's cross-examination. Lyons was provided ample opportunity to question Henderson and to expose his bias and motivation. The jury heard Henderson's testimony, observed his demeanor, and evaluated his credibility. The jury may have found that Henderson's testimony was a complete fabrication. Nevertheless, the jury was presented with evidence from many other sources upon which it could have found Lyons guilty beyond a reasonable doubt. It is not the function of this court to delve into the jury room deliberations. "Issues of credibility are within the province of the jury. On appellate review, the credibility of witnesses will not be passed upon, conflicting evidence will not be weighed, and all questions of credibility are to be resolved in favor of the State." *State v. Clemons*, 261 Kan. 66, Syl. ¶ 4, 929 P.2d 749 (1996).

Affirmed.