(23 P.3d 176)
Nos. 83,255
83,874

STATE OF KANSAS, *Appellee,*
v. TRENNIE L. CAMPBELL, *Appellant.*

—

Opinion filed May 11, 2001.

*Debra J. Wilson* and *Karen Eager*, assistant appellate defenders, and *Jessica R. Kunen*, chief appellate defender, for appellant.

*Mary A. McDonald*, special prosecutor, and *Carla J. Stovall*, attorney general, for appellee.

Before KNUDSON, P.J., LEWIS, J., and WARREN M. WILBERT, District Judge, assigned.

LEWIS, J.: Savannah Campbell died at her home on February 29, 1996, at the age of 2 years. Her mother, the defendant Trennie Campbell, was subsequently convicted of unintentional second-degree murder in the death of Savannah, along with four other counts of endangering a child. Trennie was sentenced to a controlling term of 77 months' incarceration. The trial judge then made a dispositional departure and placed Trennie on probation. This is a direct appeal by Trennie from her convictions and sentence.

Savannah was born in November 1993 to Trennie and Flint Campbell. She was their fourth child and, at the time of her death, all four children were under 8 years of age. Trennie and Flint originally lived in Arnold, Kansas, near other family members and friends.

Trennie's involvement with the State Social and Rehabilitation Services Department (SRS) began only a few weeks after Savannah was born. Savannah was initially labeled by the hospital as a child who was failing to thrive as a result of abuse and neglect. Because of this labeling by the hospital, SRS had begun to look over Trennie's shoulder—into her home life, her housekeeping, etc. It developed that the hospital was absolutely wrong in labeling Savannah as a child who was failing to thrive as a result of abuse and neglect. Savannah was a very sick little girl who was evaluated by at least

nine specialists who finally diagnosed her problem as Brandelaise Syndrome, an extremely rare blood disorder. It appears that at the time this diagnosis was made, there was only one other known case of Brandelaise Syndrome.

Savannah's failure to thrive was a result of her extremely rare disease and not because of neglect on the part of Trennie and Flint. A child with Brandelaise Syndrome has actin, a muscle fiber, present throughout his or her body's cells. Actin is a substance which nature intends to be located only in muscle tissue. When it is present in other cells, it interferes with the proper functioning of those cells. In particular, actin interferes with the ability of white cells to fight infection, and when it is present in platelets, it causes bleeding problems and can cause anemia if it is present in red blood cells. The specialist examining Savannah found actin throughout her body and not only in her muscle tissue.

The disease condition had a devastating effect on the child and her entire family. Savannah had excessive scarring in her throat caused by this disease. As a result of this scarring, she could only breathe through a trachea tube. She was fed with a gastronomy tube. The disease caused Savannah to have episodes of bloody diarrhea, excessive bruising, rashes, and an enlarged liver and spleen. Savannah required blood and platelet transfusions in order to survive and was developmentally delayed due to the disease.

Flint and Trennie were not wealthy people, and while Flint worked at a job, he barely made a living to support his family. With four children under 8 years of age at home, Trennie did not, and in fact could not, work outside of the home. Savannah's rare disease made working outside of the home impossible and caused serious hardships for the family. In order for Savannah to be closer to a large hospital, the family moved from Arnold to an apartment in Newton. The original apartment had only two bedrooms and no washer and dryer. Flint's new job in Newton kept him away from home for extended periods of time, and the job of raising the four small children fell almost exclusively on Trennie's shoulders. After a period of time, the family moved from the two-bedroom apartment into a three-bedroom home. This move simply compounded their financial difficulties. They could not afford their utilities and

could not run the air conditioner in hot weather. Their telephone was disconnected for nonpayment of the bill on a number of occasions.

Trennie was not a good housekeeper, and we suspect that the presence of four young children undoubtedly exacerbated this problem. Toys and clothing were often scattered about the house, dirty dishes were left in the kitchen, and the bathroom was not always maintained in a sanitary condition. The SRS employees who came in and out of the home with regularity did not hesitate to point out these conditions to Trennie on an almost daily basis.

Keeping Savannah at home was a daunting task which required not only considerable medical equipment but the know-how to operate this equipment. Trennie was primarily responsible for Savannah's care and was trained to operate the medical equipment and deal with Savannah's medical problems by Wesley Hospital. She was trained to use the pulse oximeter, to suction, and to operate the oxygen and feeding machines.

As a result of her tracheotomy and the scar tissue in her throat, Savannah could not breathe without her trachea tube. If the tube somehow became blocked, it adversely affected her breathing. The result is that it was necessary to suction the tube with regularity to keep it from becoming blocked. This task fell principally on Trennie. Savannah had to be fed at least five times per day, and the oxygen level of her blood had to be monitored with regularity. This also was principally Trennie's responsibility.

For a number of reasons, SRS maintained a constant presence in Trennie's home. Kim Grunden was Savannah's SRS case worker, and she had told Trennie that she had to cooperate with her and SRS or a petition alleging medical neglect would be filed. There were several nurses in and around the home placed there by SRS. These nurses assisted in the care of Savannah and were also generally critical of Trennie and her housekeeping. The testimony indicates that Trennie resented the SRS intrusion into her home and family life and wanted very much to return to her former home in Arnold, where her extended family was located.

On the morning of February 29, 1996, Trennie found Savannah dead in her crib. The trachea tube had been removed, her airway

was obstructed, and Savannah suffocated. Trennie called for Flint to come and help. Flint came down the stairs and CPR was administered, but it was to no avail.

A long arduous investigation into Savannah's death followed. Ultimately, both Trennie and Flint were charged with murder. For reasons that are not immediately apparent from the record, the charges against Flint were dropped. Trennie was placed on trial for second-degree intentional murder and six counts of endangering a child. As pointed out above, she was convicted of unintentional second-degree murder and four of the six endangering counts. Flint did not testify at the trial and, in fact, invoked his Fifth Amendment rights.

As noted, the trial judge departed dispositionally and placed Trennie on probation. He indicated that he did so because she had three other young children in addition to Savannah, and he believed she was stressed and depressed at the time of Savannah's death. The trial court also noted the rare and high maintenance disease from which Savannah suffered, along with the fact that Trennie was forced to live away from her extended family, and ultimately concluded that Trennie was not a risk to the other children.

There are other factual issues in this case, and those facts will be discussed as necessary to the determination of the issues.

On appeal, Trennie raises several issues. As will be seen, we reverse her conviction and remand the matter for a new trial. Accordingly, we will discuss the issues in this opinion in the order of their importance to our decision to reverse her conviction.

## PROSECUTORIAL MISCONDUCT

We reverse the defendant's convictions because we conclude that the prosecutor in this case was guilty of serious misconduct which denied the defendant a fair trial.

The question of whether a particular prosecutor has been guilty of misconduct in the trial of a criminal case is the subject of some relatively controversial recent decisions by our Supreme Court and by this court. The claim of prosecutorial misconduct is one that is being made with increasing frequency by defendants on appeal

from their convictions. In most of the cases, the misconduct alleged has occurred during the final argument to the jury. One of the better-reasoned and well written decisions by the Kansas Supreme Court is *State v. Pabst*, 268 Kan. 501, 996 P. 2d 321 (2000). In *Pabst*, a defendant's murder conviction was reversed because the prosecutor repeatedly referred to the defendant as a liar during final argument. We would agree that the question of what is and is not fair closing argument is one being hotly debated, and not everyone agrees that calling the defendant a liar is necessarily misconduct. However, the *Pabst* decision provides some guidelines to use in defining prosecutorial misconduct.

In this case, we conclude that the misconduct by the prosecutor was so egregious that it denied the defendant her constitutional right to a fair trial, and it leaves us with no option other than to reverse her conviction.

It is true that a criminal trial remains an adversarial matter under our system of criminal justice. Despite that fact, a prosecutor's role in a prosecution is much more than that of an adversary for the State of Kansas. The criminal justice system demands that the prosecutor not take an approach which we will describe as "winning at all costs." It appears that some prosecutors lose sight of what is at stake in a criminal prosecution and are motivated by a desire to win rather than a desire to achieve a just result. The prosecutor in this case seems to have been so motivated. In the *Pabst* decision, Justice Six defined the prosecutor's role in the following language:

"A prosecutor is a servant of the law and a representative of the people of Kansas. We are unable to locate an excuse for a prosecutor's failure to understand the remarkable responsibility he or she undertakes when rising in a courtroom to announce an appearance for the State of Kansas. Instructional materials abound on this topic. Sixty-five years ago the United States Supreme Court said that the prosecutor represents

'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution *is not that it shall win a case, but that justice shall be done.*' *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935)."

(Emphasis added.) *State v. Pabst*, 268 Kan. at 510.

We approach the issue of prosecutorial misconduct in this case in the spirit of the law as set forth above.

One of the key issues in this prosecution involved Savannah's time of death. Trennie told one of the police investigators that she had checked on Savannah some time after 4 a.m. and had suctioned the secretions from Savannah's trachea tube. She went on to say that she checked on Savannah at 6 a.m. and that Savannah was alive at that time, but that when she went into the room at 7 a.m., Savannah was not breathing and the tracheal tube had been removed. It is quite obvious that any medical evidence that Savannah's death occurred significantly earlier than 6 a.m. would be devastating to the defense.

In February 1998, the defendant filed a motion for discovery seeking "[t]he results of any and all physical, scientific, or chemical tests which the prosecution will seek to introduce in the trial of this matter . . . ."

In May 1998, the trial court held a pretrial conference. At that pretrial conference, the following discussion took place between Richard M. Blackwell, who represented the defendant, and the prosecutor, Mary McDonald.

"MR. BLACKWELL: Well, Judge, we just want to, for the record, confirm the status of discovery, if I could, that the—we have an assertion from the—or agreement from the State that we've been provided with any and all records of any witnesses that they have and that if they interview additional witnesses between now and the time of trial, we would be immediately provided with any records. If there's any additional witnesses they intend to call, then we ask that, you know, a formal motion be filed so that we have time to interview these witnesses. It's a serious matter and we'd certainly need to do that to be prepared for trial. *And there's one specific concern we have and that was that the autopsy report does not show the time of death and if there is a time of death, we'd like to be informed of that; if not, we'd like to be informed that there is no indication that there is a time of death.* But I think that just goes along with a part of the discovery motion—motions and orders, Judge."

"MS. MCDONALD: Judge, I really can't believe this comment being made because as this Court knows and as Mr. Loeffler knows and Mr. Struble knows, that any documents I've had, I have turned those over and they've been turned over for weeks and weeks now. And I also know that the Court has a rule that late endorsement of witnesses is 24 hours prior to the time that that starts, and we do that by motion and we do that properly. So I guess I feel kind of blindsided here. I don't know if—if Mr. Blackwell thinks that there's something that I have that I haven't turned over to him or—or what the deal is. But, quite frankly, I don't think I'm too hard to work with as far as discovery is concerned.

"THE COURT: Well, I think—

"MR. BLACKWELL: That wasn't the question, Judge. I've got a client charged with murder. I am not making a shot at the County Attorney's office and she didn't answer the question. The question was whether we have everything and whether we'll—and that's all it was, Judge. This is a serious matter and I need to know it for the record." (Emphasis added.)

It is apparent based upon the representations of the prosecution that it had no evidence concerning the time of Savannah's death, and the defense approached the trial of the case with the belief that no such evidence existed. It develops that the defense was wrong.

The trial of this case took place in February 1999, and at that trial, Dr. Audrey Roberts, Savannah's pediatrician, testified as a witness *for the State*. She testified that in her opinion, Savannah had been dead between 4 and 10 hours when she was brought into the emergency room at 7:50 a.m. The testimony of Dr. Roberts placed the time of death somewhere between 9:40 p.m. the previous evening and 3:50 a.m. on the date of death. This testimony is obviously inconsistent with the statements made by Trennie as to when she discovered the child had died.

On cross-examination, Dr. Roberts testified that she had done her research on determining the time of death in August or September 1998, and the following discussion then took place:

"Q. And the studies that you refer to about the potassium and the research that you have done on the internet, when did you do that research?

"A. Um, I do not recall saying I researched the potassium, I researched the core temperature and how that plays a role in, um, determining time of death. The potassium is more based on clinical experience with other code situations and the two years I dealt on the Child Death Review Board.

"Q. Core temperature then, I'm curious, when did you perform your internet research on that?

"A. Uh, it would have been, I don't know, the last time that trial was scheduled. Which was that August, September of '98.

"Q. Did you ever generate any kind of report or provide anyone with any information regarding these studies?

"A. Um, I had talked to Detective Walton about it and Mary McDonald.

"Q. So, you discussed with Mr. Walton this core temperature theory?

"A. He asked my opinion on it, yes.

"Q. And where does that conversation take place?

"A. Um, at my office.

"Q. And you say the last time this was scheduled for trial. Do you have any recollection the month that might have been?

"A. I would have to look at my calendar at home to know the exact date. It was the week before it was scheduled to go to trial.

"Q. That would have been in the fall of last year?

"A. Yeah.

. . . .

"Q. And your office notes, in concluding the file on Savannah, made for reference to this, these two things which you had done?

"A. What two things that I had done?

"Q. The potassium and the core temperature?

"A. No.

"Q. And if I understand correctly from your testimony on Friday, your estimate as to the time of death was not made until sometime last fall, 1998?

"A. I was never asked that question until then.

"Q. And you never put it in your notes in anyplace?

"A. No."

It is clear to us from the record on appeal that the prosecutor in this case had information concerning the time of the death of Savannah approximately 7 months prior to the date of trial and failed to disclose this information to defense counsel. In fact, at the time of pretrial as is shown above, the prosecutor expressed exasperation over the fact that the defense counsel could even believe that she had information concerning the time of death which had not been disclosed. The prosecutor's failure to disclose is exacerbated by the fact that she deliberately misled defense counsel. The truth is, we feel that she lied to defense counsel and to the court in denying that she had time of death evidence.

In a posttrial hearing on defendant's motion for a new trial, the prosecutor admitted that Dr. Roberts had determined the time of death at *her request* and that she had the evidence prior to trial and did not disclose it. The justification by the prosecutor for this outrageous conduct shows her lack of regard for due process and her lack of understanding as to her proper role in our system of criminal justice. The prosecutor attempts to justify her conduct in failing to disclose this information by arguing that Dr. Roberts' opinion was *not in writing*. In this regard, the record shows that the prosecutor responded in the posttrial hearing as follows:

"[MS. MCDONALD:] The third thing is the newly discovered evidence. And they claim—well, I'm sorry, the third thing is the new information sprung on them at trial and that's— that's a pretty good word, sprung on them at trial.

"What—what Mrs. Campbell complains about is that at one point in time Doctor Roberts testified that she had calculated time of death within a certain number of hours based upon core temperature. As I told the Court at the time that we took this up, and there was an objection made and the Court ruled again, at the time, that this information was admissible, as I told the Court at the time, this information came up in a pretrial conference with Doctor Roberts.

"This case was originally set for October. Detective—

"THE COURT: You mean between you and Doctor Roberts?'

"MS. MCDONALD: That's correct. Detective Walton was present, Doctor Patron was present and we were getting them ready to go to trial, to tell them what was involved, what they needed to do, what time they needed to come in. And at that point in time, I asked Doctor Roberts to tell me if she had any idea or could tab some sort of time of death. At that point in time, she, in preparation for trial said, well, I think this is what it would be.

"After that, and without any requests from the State, she researched the issue a little bit more so that she could be absolutely certain at the time of trial that what she had originally quoted was, in fact, based upon medical certainty.

"Well, this is not the subject of any type of report, it was never put down into any type of report, it was the topic of a pretrial conference where we were just getting our doctors ready to go to trial the first time it was set.

"Certainly, Doctor Roberts would have been more than happy to talk to Mr. Struble if he had called and said, you know, I would like to talk, sit down and talk to you, pretrial so that I can discuss that with you. If they had called my office and said, I would like to interview Doctor Roberts, I certainly would have made her available so they could ask the same questions that I asked.

"The State is not, is not, obligated to go out and investigate the case for the defense. The State is only obligated to give the reports that are in our possession over to the defense. We are not obligated to go out and have the topic of pretrial conferences reduced to writing so that the defendant can have it, with one exception. And that exception is for *Brady* material; exculpatory evidence. Time of death in this case didn't exculp her from the crime. That was inculpatory evidence and the State is not, is not, required to provide inculpatory evidence discovered in a pretrial conference.

"Now, if Doctor Roberts would have said, well, the time of death is outside the time that this defendant could have committed the crime, that would have been *Brady* material and at that point, the State has a duty to have that reduced to writing or to place a phone call to Mr. Struble to say, hey, in our pretrial conference, we found some exculpatory material and we are under a duty to produce that. This was inculpatory all down the line. Not the topic of any reports.

*"Had Doctor Roberts written me a report that said, this is the time of death and these are the studies I considered, produced it to me so that I had it in my*

*possession, as part of my open file policy, I would have provided a copy to Mr. Struble. But that was never reduced to writing.*

"Mr. Struble certainly had every last medical report that I had in this case. And Mr. Struble can ask the same types of questions that I ask in preparing for trial. He can go get his own doctors and say this is what the core temperature was, this is what the baby was like when she was brought in, you give me an estimate of time of death. He could have done that to Doctor Roberts, just like I did. So, he had everything that I had. I went one step further and personally interviewed my witness prior to putting her on the stand.

"I want to point out to the Court that Mr. Struble at the time Doctor Roberts testified, I don't recall if he objected or not, I think he did, but when he objected, the Court allowed liberal cross-examination of Doctor Roberts as to how she came across that figure. And she talked about the studies she had looked [*sic*], at the internet studies she had done and I believe at the time she was being cross-examined by Mr. Struble, he was intentionally cross-examining her about finding studies on the internet and how could she be certain about the potassium levels and things like that. So, that point was fully explored through Doctor Roberts' testimony.

"Again, Mr. Struble had the absolute right to talk to any witnesses pretrial and certainly, if the request had been made, I would have made her available for interview. That was not done. We are not required to have each and every witness put each and every thing that they say down in pretrial conference or preparation conference for trial, into writing. Only if it is *Brady* and it wasn't *Brady*." (Emphasis added.)

The comments of the prosecutor indicate to us that she approached the case with a "win at all costs" frame of mind. Indeed, we doubt if even today the prosecutor realizes the seriousness of her misrepresentations and of her misconduct.

The defense had been assured by the prosecution that it had the entire contents of the prosecutor's file and that it had no time of death evidence which would be offered at trial. At the time these comments were made by the prosecutor, they were deliberate falsehoods. We cannot condone lying perpetrated by a member of the bar of this state in order to "win" an action involving the life and freedom of another human being. We have every right to expect more from attorneys in this state and certainly from prosecutors who have a compelling obligation to see that justice is done in every criminal prosecution and who have no right to engage in "win at all costs" conduct.

This case has some similarity to the decision *State v. Lewis*, 238 Kan. 94, 708 P.2d 196 (1985). In that case, the Supreme Court reversed a criminal conviction because of misconduct of the prosecutor similar to that involved in this case. In the *Lewis* case, the prosecutor had delivered defense counsel a written report by her expert witness which indicated that the expert had found no blood on either knife involved in the prosecution. The prosecutor failed to disclose to defense counsel that subsequent to the written report, the State's expert did find blood on the knife and would so testify at trial. The expert witness testified at trial that she had changed her opinion as stated in the written report and that she had found blood on one of the knives. The Supreme Court, in reversing the defendant's conviction, said:

"In this case, however, both defense counsel had based their defense strategies partially on the belief that the State's expert witness would testify that her examination determined that there was no blood on either knife. In opening statements each defense counsel emphasized this glaring fact to the jury. If Gardner had been cut by a knife, as he claimed, blood would be found on the knife used to attack Gardner. After opening statements were made, during the trial and in the presence of the jury, the State used the corrected report to defeat the defense theory. Such a disclosure could hardly go unnoticed by the jury.

"Prosecutorial misconduct occurs when the county attorney fails to disclose to both the trial judge and the defense counsel that he intends to introduce into evidence a report which he failed to inform the defense counsel had been corrected. If the corrected statement changes the theory of defense as presented to the jury in opening statement, then neither admonition nor instructions by the trial judge can cure the resulting prejudice. The trial court abused its discretion when it failed to grant each defendant a new trial. Neither admonition nor instruction by the trial judge could insure that the defendants would receive a fair trial. It was necessary for the judge to protect the defendants' fundamental rights by granting a new trial." 238 Kan. at 99.

Our sentiments are in line with the comments by the Supreme Court set forth above.

We hold that a prosecutor is guilty of serious misconduct when he or she leads a defendant to believe that there is no evidence, expert or otherwise, written or oral, on a particular fact in controversy when, at the time of such representation, the prosecutor does have evidence on such fact whether in written form or otherwise and such evidence is offered and admitted at the time of the trial.

We have determined that the prosecutor was guilty of misconduct. In this state, three factors are to be considered in determining this issue. First, was the prosecutorial misconduct so gross and flagrant as to prejudice the jury against the defendant? Second, do the statements show ill will by the prosecutor? Third, is the whole evidence against the defendant so overwhelming that there was little or no likelihood the prosecutor's prejudicial conduct changed the result of the trial? *State v. Follin*, 263 Kan. 28, 45, 947 P.2d 8 (1997).

In this case, we answer the first two questions in the affirmative and the third question in the negative. Defense counsel specifically asked for information regarding time of death in order to prepare for trial. The State deliberately and willfully withheld that information. This conduct was gross and flagrant and showed deliberate ill will. The evidence against Trennie was not overwhelming, and if defense counsel had been able to prepare for the time of death evidence offered by the State, the result of the trial may have been different. In short, the prosecutorial misconduct in this case requires that we reverse Trennie's conviction and remand for a new trial.

The prosecution has also argued that the defense failed to object to the time of death testimony when it was given during the trial. We do not consider this to be relevant since the State's failure to disclose the information was willful misconduct which denied Trennie's right to confrontation and to a fair trial. We apply the plain error rule and conclude that the absence of an objection by the defense does not affect our decision to reverse the conviction.

## HEARSAY EVIDENCE

Trennie argues that in one instance the trial court erred when it refused to admit certain hearsay evidence and in another instance when it erred in admitting such evidence. After reviewing the record, we agree with Trennie's position in this matter. Our decision is based on the same rationale which we used in the case of *State v. Brickhouse*, 20 Kan. App. 2d 495, 890 P.2d 353, *rev. denied* 257 Kan. 1093 (1995). In that case, we reversed a defendant's conviction because the application of the hearsay rules had rendered his

trial fundamentally unfair and had deprived him of due process of law. In reaching our decision in *Brickhouse*, we relied on the United States Supreme Court decision of *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed 2d 297, 93 S. Ct. 1038 (1973), in which that Court said that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." 410 U.S. at 302. In the instant matter, we do not directly indicate that the hearsay rule was mechanistically applied as such. However, we believe that it was applied in such a manner that it affected Trennie's constitutional rights and directly affected the ascertainment of her guilt to an extent that it defeated the ends of justice and violated her due process rights.

The first instance deals with a statement made by Flint. Flint was originally made a codefendant along with Trennie, and he was in the home the evening before and the morning of Savannah's death. The evidence indicated that Flint had, somewhat uncharacteristically, spent the day before Savannah's death at home and that he spent a great deal of time taking pictures of her with a new camera which he had obtained. It is obvious that Flint had equal access to Savannah's room on the night before and the morning of her death. It is further obvious that Savannah's illness had a significant and negative impact on Flint. In view of the absence of clear evidence as to what caused Savannah's death, we understand why the State charged Flint as a codefendant. We do not understand why those charges were dismissed.

It is obvious that Trennie's best interests lie in at least inferring to the jury that Savannah's death was due to Flint's actions. Flint refused to testify at the trial and claimed his Fifth Amendment rights. However, at the trial, Jimmy Skinner, Trennie's brother, testified that on the day of Savannah's death, Flint said, "At 6:00 or 7:00 I had a daughter and now she's dead and I'm going to prison."

The record indicates that while he was in jail, being held as a suspect in Savannah's death, Flint told another jail inmate by the name of Oscar Henry that he had killed Savannah. After Flint had confessed to Henry, Henry made a statement to Detective T. Wal-

ton in which he gave significant details about Savannah's death. He advised Detective Walton that Flint had told him that he got fed up with all of it and got drunk. He went on to say that he took pictures of Savannah the day before she died so he could remember her that way. He told Henry that he put Savannah to bed and decided to let her go in the night. He indicated that Savannah was a burden and that he wanted to get rid of SRS's involvement in their family. At the trial, Trennie attempted to introduce, through Detective Walton, Henry's recollection of what he was told by Flint. At the time the evidence was offered, Detective Walton was in court, Henry was available to testify, and Flint had indicated that he was relying on his Fifth Amendment rights. The trial court refused to allow Detective Walton to testify about Flint's confession to Henry. Henry was available to testify and did appear in court; however, Henry could not remember the details of his statement to Detective Walton, and the trial court ruled that Henry was an unavailable witness and precluded the defense from using any part of his statement at trial.

We hold that the trial court erred in refusing to admit Detective Walton's testimony concerning the statement Flint made to Henry, and we conclude that the error is reversible error which will require a new trial.

This particular incident also illustrates the "win at all costs" attitude taken by the prosecutor in this case. The statement made to Detective Walton was apparently considered reliable by the State because it used that statement to get Trennie to plead and it also used it to urge the court to sever Flint's charge so that his confession could be used. The State, in using Henry's statement to Detective Walton, indicated that no threats, promises, or deals were made to secure the statement. Despite the fact that the State was at almost all times the proponent of this statement and used it for its own purposes, the prosecutor objected to its admission at Trennie's trial when Trennie sought to use the statement in her own defense.

At the close of its case, the State moved to exclude Henry's testimony as well as his statement to Detective Walton on the grounds that Henry was unavailable as a witness. The argument

was made that Henry was unavailable because he could not remember the content of his statement to police. This led the State to the conclusion that since Henry was unavailable, his statement to Detective Walton was inadmissible hearsay.

The evidence of Henry was proffered, and during the proffer, Henry took the stand. He told the court that he was housed in jail with Flint and that he remembered talking with Flint about the charges pending against him. Henry also testified that he remembered talking to Detective Walton. When asked about the content of his statement to Detective Walton, Henry said, "I really don't recall anything that was—was said. It was over a year ago and I don't have a very good memory." The trial court held that Henry was unavailable as a witness and excluded all evidence relating to Flint's confession to Henry as hearsay. Flint, of course, was unable to be questioned about the confession because he had invoked his rights against self-incrimination.

A trial court is given considerable discretion in admitting statements under the hearsay exception for unavailable witnesses. *State v. Stafford*, 255 Kan. 807, 810, 878 P.2d 820 (1994). When unavailability is an issue, whether the witness is available is a question of law. *State v. Sanders*, 258 Kan. 409, 418, 904 P.2d 951 (1995).

Henry was present and available to testify at trial. The real issue is whether his lack of memory as to the details of the confession are sufficient to brand him as an unavailable witness. A witness is not unavailable simply because he or she claims he or she cannot remember the incident. *State v. Todd*, 24 Kan. App. 2d 796, 801, 954 P.2d 1 (1998). In order for the trial court to make a finding of unavailability, it must distinguish between a witness who, in bad faith, feigns memory loss and a witness who, in good faith, is unable to testify because of genuine memory loss. *State v. Lomax & Williams*, 227 Kan. 651, 661-62, 608 P.2d 959 (1980).

Henry did not refuse to testify in this case. In fact, he testified that he remembered Flint making the statement to him and that he made a statement to Detective Walton. He just did not remember the details of that statement. We conclude that inasmuch as Henry remembered talking to Flint and remembered providing the statement to the detective, this is a sufficient basis for cross-ex-

amination. We hold that the trial court abused its discretion in declaring Henry unavailable as a witness.

Flint's confession should have been admitted under K.S.A. 2000 Supp. 60-460(a), which permits hearsay evidence based on previous statements of persons present. If Henry had taken the stand and testified that Flint had confessed to him, it would be admissible as a declaration by Flint against interest. K.S.A. 2000 Supp. 60-460(j). The fact that Henry did not remember all of the details of the statement did not make him unreliable as a witness, but could have been exploited by the State in placing his credibility in question in front of the jury.

The next hearsay issue involves Flint's statements to Detective Walton which were admitted by the trial court. Trennie suggests that the trial court erred in admitting those statements as res gestae evidence.

Wide latitude is given to the trial court in determining whether evidence is part of the res gestae. *State v. Sanders,* 258 Kan. at 423. Res gestae allows evidence of actions done, as well as declarations made, before, during, or after the occurrence of the principal event. The acts of declarations become admissible res gestae if they are so closely connected with the occurrence as to become a part of the occurrence. Res gestae acts can be separated from the primary occurrence by lapse of time but are illustrative of the primary act. Res gestae acts can be admitted to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *State v. Edwards,* 264 Kan. 177, 200, 955 P.2d 1276 (1998).

In *Edwards,* the court indicated that declarations made as a part of the res gestae are not admitted into evidence without limitation but are governed by the rules of evidence. Thus, the court held, in order to be admissible, res gestae evidence must still conform to the requirements of 60-460. 264 Kan. at 200. As a result, the evidence must still meet an exception in order to be admitted. The State seems to believe that res gestae is treated as independent of the hearsay rule, and we conclude that this is an erroneous belief. In fact, in *State v. Drach,* 268 Kan. 636, 648-49, 1 P.3d 864 (2000), Justice Six stated in a concurring opinion that "[r]es gestae, as an

independent evidentiary concept, deserves a proper burial." 268 Kan. at 651-52. We acknowledge that Justice Six's statement was in a concurring opinion and does not constitute a binding ruling of the Supreme Court. However, it indicates the direction in which the court may be moving, a direction with which we agree.

On the morning of Savannah's death, Detective Walton interviewed Flint. According to the testimony of Detective Walton, Flint identified a certain trachea tube as the tube he found in Savannah's crib. The trachea tube was important because the ties were too short to go around Savannah's neck and appeared to have been cut. The theory was that if it was indeed the trachea tube that was inserted into Savannah the night before, someone must have cut the ties.

Flint was certainly not available for cross-examination and was not available as a witness, having claimed his Fifth Amendment rights. For that reason, this evidence is pure hearsay and does not come in under any hearsay exception of which we are aware. We conclude that the trial court erred in admitting this evidence under the hearsay rule.

## CROSS-EXAMINATION OF TRENNIE

Trennie argues that the comments of the prosecutor during cross-examination constitute prosecutorial misconduct and denied her right to a fair trial. Since we have previously visited that issue, we see no need to discuss again the elements of prosecutorial misconduct. In short, when a prosecutor's comments are so prejudicial to rise to the level of a constitutional violation, that violation results in plain error and no contemporaneous objection is required. *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999).

In this case, Trennie was forced by the State on cross-examination to comment on the credibility of other witnesses. Although a contemporaneous objection was not made on the grounds that it was improper to force the witness to comment on the credibility of other witnesses, defense counsel did object to the use of the term "liar" as used by the prosecutor, and the objection was sustained.

We point out the following exchange:

"Q. Are you telling me Sandy Elliott has come in here and made all this stuff up, so we could listen to it?

"A. I don't know if she made it—made it all up or what, but I don't know what she was seeing, but that never happened.

"Q. Are you telling me that Sandy Elliott is a liar in relation to that?

"MR. STRUBLE: Objection, Your Honor, I don't think that is appropriate.

"MS. MCDONALD: Sure it is, Judge, I can use that term, to accuse somebody of being a liar.

"THE COURT: I am going to sustain the objection."

After the trial court sustained Trennie's objection to the prosecutor's tactics, the prosecutor simply eliminated the word "liar" from her questions, but continued to ask Trennie to comment on the credibility of the State's witnesses. She asked Trennie if all the State's witnesses were making their testimonies up. Later, she again asked if the testimonies of the State's witnesses were misstatements.

We consider the State's tactics on cross-examination to once again be illustrative of its "win at all costs" attitude. Although there is no question that the State is allowed to ask a witness about inconsistencies in her own testimony, this cross-examination went beyond that and asked her to comment upon the veracity of the other witnesses offered by the State. This did not occur just once, but several times. We conclude that this technique should not and will not be tolerated. It is possible that if this were the only error in this case, it might not constitute reversible error. However, when it is coupled with the other errors in this trial, the effect is cumulative and, again, we base our reversal of Trennie's conviction on prosecutorial misconduct in questioning her concerning the veracity of the State's other witnesses.

## OTHER ISSUES

It is obvious from what was said earlier in this opinion that Trennie's conviction is reversed and that a new trial will be required. We have attempted to comment upon those issues which necessitated our reversal of the defendant's conviction. There are other issues raised in the briefs which are basically moot. However, we will comment briefly on those issues in the event that they should come to light in the proceedings for a new trial.

Trennie argues that Dr. Roberts should not have been allowed to testify concerning Savannah's time of death because the necessary foundation to establish that she had the requisite skill, training, and professional experience to give this testimony was not laid.

Although the issue is close, we do not believe the trial court abused its discretion in allowing the expert witness to testify as to the time of Savannah's death. There is no question about Dr. Roberts' knowledge pertaining to the death, and we cannot say that no reasonable person would agree with the trial court's decision to admit the testimony. We would hope that a better and more complete foundation is laid in the event of a new trial, but we do not find sufficient error in this regard to reverse the defendant's conviction.

On closing argument, the prosecutor argued an aiding and abetting theory to convince the jury of Trennie's guilt when, in fact, the jury had not been instructed on that theory.

Unfortunately, there was no contemporaneous objection to the State's comments in this case. If there had been, we suspect the trial court might have sustained an objection and instructed the jury to ignore the prosecutor's aiding and abetting comments. The failure to make a contemporaneous objection to the argument at the time the comments were made is fatal to the issue on appeal.

## DISPOSITIONAL DEPARTURE SENTENCE

The State argues the trial court erred in making a dispositional departure in this case and placing Trennie on probation. We disagree.

We think the record in this case contains ample reason to support the trial court's dispositional departure. An example of the attitude of the prosecution in this case might be found in the fact that it asked the court to double her presumptive sentence of imprisonment and to run the convictions of child endangerment consecutive to the unintentional second-degree murder conviction. With this attitude, it is no wonder that the State was upset when the trial court placed Trennie on probation.

We see no reason to expand this opinion on the issue at hand. We hold that the mitigating factors relied upon by the court during

sentencing are supported by the record and are substantial and compelling and that the trial court did not err in granting the dispositional departure and placing Trennie on probation.

We close this opinion by commenting upon the defendant's conviction of four counts of child endangerment. It is possible that under other circumstances we would allow the child endangerment convictions to stand. However, we have concluded that this case is so full of error and so permeated by prosecutorial misconduct that the entire trial was skewed and did not comport with our concept of what a constitutionally fair trial ought to be. For that reason, we reverse all of Trennie's convictions.

We reverse the defendant's convictions and remand the matter for a new trial consistent with the requirements of this opinion.

Reversed and remanded.

KNUDSON, J., concurring: I agree with the points of law decided by the majority and the decision that Campbell is entitled to a new trial.