No. 97,020

STATE OF KANSAS, *Appellee*, v. WALLACE L. DIXON, III, *Appellant*.

(209 P.3d 675)

48

Opinion filed June 19, 2009.

*Sarah E. Johnson*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jared S. Maag*, deputy solicitor general, argued the cause, and *Rebecca E. Rand*, assistant attorney general, and *Paul J. Morrison*, attorney general, were with him on the brief for appellee.

The opinion was delivered by

BEIER, J.: Defendant Wallace L. Dixon, III, brings this appeal challenging his convictions on two counts of felony murder and other offenses arising out of an apartment explosion in Emporia. We affirm.

Dixon challenges: (1) refusal to grant a mistrial because a witness altered his opinion on the stand; (2) refusal to grant a mistrial because a juror saw Dixon in shackles; (3) refusal to give instructions on certain lesser included offenses; (4) refusal to give a unanimity instruction regarding the underlying crime for the burglary charges; (5) adequacy of the felony-murder, burglary, and criminal damage to property elements instructions; (6) admission of evidence that Dixon's mother attempted to obstruct investigation of the explosion; and (7) cumulative error.

*Factual and Procedural Background*

This appeal follows Dixon's retrial after our decision in *State v. Dixon*, 279 Kan. 563, 112 P.3d 883 (2005) (*Dixon I*). Our opinion in Dixon's first appeal recites much of the pertinent factual and procedural background, which we will not repeat here. It is enough to say that Dixon was involved in a series of events leading up to a July 29, 2001, explosion and fire at an Emporia apartment complex, which resulted in the deaths of Dana Hudson and her infant son, as well as injuries to other residents and those who attempted to assist at the scene.

On remand, the district judge initially denied a defense motion to change venue but granted it after jury questionnaires were returned. The case was moved from Lyon County to Saline County. The charges at issue in the second trial mirrored those in the first: two counts of first-degree murder, in violation of K.S.A. 21-3401;

aggravated arson, in violation of K.S.A. 21-3719; six counts of aggravated battery, in violation of K.S.A. 21-3414(a)(2)(A) and (B); two counts of burglary, in violation of K.S.A. 21-3715; felony theft, in violation of K.S.A. 21-3701; criminal damage to property, in violation of K.S.A. 21-3720; aggravated assault, in violation of K.S.A. 21-3410; and criminal possession of a firearm, in violation of K.S.A. 21-4204.

The State notified the court and Dixon of its intent to pursue the alternative charge of felony murder based on aggravated arson, anticipating correctly that the evidence in the second trial would be largely identical to the evidence in the first. The following events and comparisons between the first and the second trials bear specific mention because of their particular importance to the issues here.

Expert Testimony

Ethan Griffin, one of Dixon's accomplices, had testified during the first trial that he believed Dixon kicked the stove in Alicia Shaw's apartment, which he saw lying on its side when he and Dixon left the apartment. In the second trial, Griffin was a hostile witness. He admitted that he had heard the stove fall and that he had testified before that Dixon had kicked or pushed the stove.

Dixon's theory of the case was that agents of the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) pressured Griffin into fabricating this portion of his story because ATF believed a gas leak from the stove was the best explanation for the explosion at the apartment complex. Defense counsel maintained that the evidence, including burn patterns and expert testimony from ATF's Peter Lobdell, would demonstrate that the stove was upright when the explosion occurred.

As he did in the first trial, Lobdell, a certified fire investigator with ATF, testified for the State concerning the cause of the explosion and fire. Dixon's counsel objected to a portion of Lobdell's testimony on the ground that it represented a change from his prior testimony and his original report.

In the first trial, Lobdell had observed that flexible tubing connecting the rigid natural gas supply pipe to the stove was intact but

that the "supply pipe was manually manipulated to cause it to fail, to leak and emit gas into the apartment." In his expert opinion, he said, the manipulation of the pipe was an intentional criminal incendiary act. On cross-examination, he suggested that, in light of burn patterns on the stove, it could not have been situated on its side during the explosion.

On retrial, Lobdell again explained that the flexible tubing was intact and that the supply pipe had been manipulated and cracked. On cross-examination, however, he suggested that the stove could have been either on its side or upright at the time of the blast; he had no way to be certain. Lobdell acknowledged that he had said during the first trial that he did not think the stove could have been on its side. His ultimate opinion—that the pipe had been manually manipulated, creating a gas leak, and that the explosion was caused by an "intentional incendiary act"—remained unchanged.

The State also offered the testimony of a second expert, Dr. Mario P. Gomez, a professor of mechanical engineering, whom the ATF had hired to work as a consultant with Lobdell. Gomez testified at both trials that his observations led him to believe the supply pipe was "voluntarily" cracked or broken and had leaked natural gas into the apartment. Because natural gas is lighter than air, Gomez testified, it pooled near the ceiling, and the explosion created a powerful blast downward from a point somewhere above the apartment's refrigerator. Gomez opined at both trials that he believed the stove was on its side during the explosion. He also stated that he had learned since writing his report that the stove was found on its side, which was consistent with the damage he observed. He clarified, however, that the stove could have been either on its side or upright at the time of the explosion, that it made no difference whether it was standing, because "the same side was hit by the wave."

Dixon's counsel sought a mistrial after hearing Lobdell's testimony, claiming that the prosecution failed to notify the defense of Lobdell's change in his opinion. The State argued that there was no 180-degree change in the testimony, that the prosecution was unaware Lobdell had modified his opinion, and that the detail regarding the position of the stove was not significant. The district

judge recessed to review case law, then questioned the prosecutor about whether the State had requested updated reports from its experts and questioned the defense about how the detail affected its strategy. The judge also reviewed a third expert's report, which had been obtained but not admitted by defense counsel; this report suggested that the stove may not have been upright at the time of the explosion. Ultimately, the judge denied the request for mistrial, stating:

"In considering this motion for mistrial, I note that the testimony of [Lobdell] in the first trial of the case fairly clearly evidenced his belief that the stove was upright at the time of the blast damage. His testimony here at this trial, in my view, indicated that that was still his belief, but he further expanded his opinion in this trial and went out on a limb to indicate that there may have been one other position for the stove that would have allowed it to receive the same amount of damage during the explosion as he observed, thinking the stove was upright. That was an expansion of his opinion, but apparently it is not reflected in any report nor did he make that information known to the State at any time prior to his testimony so that the State could have passed that to defense counsel."

The judge also noted that there had been no change in Gomez' opinion, who believed that the stove was on its side, despite a diagram in his report showing the stove sitting upright. The district court also observed that *State v. Lewis,* 238 Kan. 94, 97, 708 P.2d 196 (1985), to which the defense had directed his attention, did not require mistrial if an expert changes his or her position. Only if "the defendant has relied upon it to the point where now the defense would have been seriously prejudiced, then no admonition from the Court or instructions from the trial judge is going to make any difference and a mistrial would be mandated." The judge concluded that reports from other experts had put the defense on notice that there were questions about the position of the stove at the time of the blast. Furthermore, the defense had received a full opportunity to cross-examine, which established that there was "plenty of confusion as to where the stove was or was not"; there was no clear prejudice to defendant's position in any significant respect; and, "[i]f anything; [the discrepancy] has given the defense yet another tool to point out that perhaps the testimony, certainly, of [Lobdell] should not be accepted."

Shackles

During the retrial, it came to the district judge's attention that one juror had seen or heard Dixon in leg shackles and had told at least three other jurors about it. Dixon requested a mistrial, citing *Deck v. Missouri*, 544 U.S. 622, 635, 161 L. Ed. 2d 953, 125 S. Ct. 2007 (2005). The State asserted that Kansas law did not require a mistrial if the jury inadvertently viewed a defendant in leg restraints and that a curative instruction should be adequate to correct any problem.

The district judge questioned the juror directly, and the juror said he heard Dixon coming into the courtroom with shackles and told three other jurors. The judge asked the juror if the incident would "in any way affect the manner in which you have viewed this case" or "cause you to feel one way or another for or against [Dixon's] guilt or innocence." The juror replied, "No." The judge did not follow up with the three other jurors before denying the motion for a mistrial. The judge asked the defense if a curative instruction was desired; when he did not receive a direct response, the following instruction was given:

"Members of the jury, late this morning it came to my attention that one or more of you may have had occasion to observe [Dixon] while coming or going from the courtroom and may have shared information regarding your observations [with] other jurors. I want to make clear to you that the manner in which [Dixon] arrives in the courtroom is not a matter that has any bearing whatsoever on this proceeding. It makes no difference. You're to draw no inferences from anything that you have seen or heard, and specifically I'm instructing you to disregard in these further proceedings any information with regard to the mode, mechanism of the transport or the appearance of [Dixon] here in any way. Simply put, it's not appropriate to consider those things."

Defendant's Mother

On the morning of July 29, 2001, when Shaw learned of the blast and fire at her apartment, she called Dixon and accused him of causing it. Shaw testified that when she called she was in her car with her sister, who had been Dixon's girlfriend, and a friend, Jessica Todd Bickerstaff. The women were driving to Emporia after spending the previous night in Topeka. At some point, Shaw hung up on Dixon. A call then came in on Shaw's sister's cell phone from

Dixon's mother, Gwen Rios. Shaw answered the call. Shaw testified that, once Rios recognized that she was speaking with Shaw, Rios asked her if something had happened at her apartment. Shaw told Rios that she knew Dixon had something to do with it and that she was going straight to the police when she arrived in Emporia. Rios pleaded with her, " 'Oh, please don't do that. Can we talk first? I can replace everything that you lost.' " Shaw testified that Rios "wanted to give her money not to tell [the police], to replace any furniture or anything that I had lost." Shaw did not accept Rios' offer.

Bickerstaff also testified about the call. Todd asserted that Dixon's mother said she would replace Shaw's lost belongings, that she would give Shaw "money for a new place and new toys for her kid and she wouldn't have to worry about anything if she—if she didn't say anything . . . about [Dixon's involvement in the apartment] complex blowing up."

Dixon's counsel objected to this evidence; the district judge noted the objection but did not sustain it.

In Dixon's later testimony, Dixon said that he had called his mother after Shaw accused him of being involved in the explosion and fire, that he told his mother that Shaw and her sister were making accusations, and that he hoped his mother could talk more calmly with them.

## Jury Instructions

Dixon requested instructions on second-degree murder and involuntary manslaughter as lesser included offenses of felony murder, suggesting that evidence of either aggravated arson or burglary as the underlying felony was weak or inconclusive. The State argued in response that Dixon need not be charged with or convicted of an underlying felony in order for the felony to support felony murder and that proof of burglary does not require commission of the offense intended when an unlawful entry is made. The district judge rejected the defense request for the lesser included instructions, noting that the evidence in support of the felonies was nearly identical in both trials and that Dixon had not been entitled to the instructions in the first trial.

Verdict

The jury found Dixon guilty of two counts of felony murder, based on the underlying felony of burglary, attempted burglary or flight from burglary; two counts of aggravated battery; two counts of burglary; theft of an undetermined value; felony criminal damage to property worth at least $500 but less than $25,000; and criminal possession of a firearm. The jury acquitted Dixon of aggravated arson, two counts of aggravated battery, and aggravated assault. The district judge dismissed the remaining counts after a defense motion at the close of the State's case.

## Mistrial for Change in Expert Testimony

A district judge may declare a mistrial if prejudicial conduct makes it impossible to proceed with a trial without injustice to the defendant. K.S.A. 22-3423(1)(c). Declaration of a mistrial is a matter entrusted to the district court's discretion, and the judge's choice will not be set aside without an abuse of that discretion. *State v. Daniels*, 278 Kan. 53, 66-67, 91 P.3d 1147, *cert. denied* 543 U.S. 982 (2004); *State v. Manning*, 270 Kan. 674, 696, 19 P.3d 84 (2001). An appellate court's inquiry should consider whether a limiting instruction was given, the degree of prejudice, and whether any evidence improperly admitted would affect the outcome of the trial. *State v. Sanders*, 263 Kan. 317, 324, 949 P.2d 1084 (1997).

As before the district judge, Dixon attempts on appeal to compare his situation to that in *Lewis*, 238 Kan. 94. He also directs our attention to *State v. Campbell*, 29 Kan. App. 2d 50, 23 P.3d 176 (2001).

In *Lewis*, two defendants were accused of forcing their way into the home of their former drug supplier, placing a knife to his throat, and demanding money. When none was forthcoming, the victim was beaten. The altercation resulted in a cut on the victim's arm and violent separation from much of his hair. The victim reported the incident, and a search of one defendant's car revealed a large knife, a small knife, and a hunk of unattached hair.

Before trial, the State informed the defendants that a KBI report showed the victim's blood on two jackets taken from the defendants

but not on the large knife. At trial, defendants' theory was that they were both at the victim's apartment; that one defendant got into an argument with the victim and the victim struck him; that, while fighting, the victim cut himself on broken glass; and that the victim called police with the story of the break-in and knifing because he was spiteful and vengeful. Defendants repeatedly relied upon the absence of blood on the large knife, which, in their view, made the State's theory of the crime impossible. Defendants did not know until the KBI expert testified for the State on direct examination that she had erred when she reported no blood from the victim on the large knife. The State had not disclosed this development, and the defense moved for a mistrial. The district judge denied the motion, instead striking the expert's testimony and giving a limiting instruction to the jury.

On appeal, the *Lewis* defendants argued that the district judge erred in denying the mistrial, and this court agreed. Noting that a judge's power to declare a mistrial must be exercised with great caution, we held that a mistrial is warranted if the damaging effect of prejudicial conduct cannot be removed by admonition and instruction. This court regarded the prosecutor's failure to disclose to the defendants and the district judge that its expert would testify in a manner materially contrary to her written report as such was prejudicial conduct; it could not be effectively cured by striking the expert's testimony or by giving a limiting instruction. *Lewis*, 238 Kan. at 97-99.

In *Campbell,* the defendant was tried in the death of her critically ill 2-year-old child, and one of the pivotal issues involved the child's time of death. The defendant informed a police investigator that she checked on her daughter sometime after 4 a.m. and suctioned secretions from her daughter's trachea tube. The defendant also said that she checked on her daughter at 6 a.m. and that she was alive at that time. By 7 a.m., she said, her daughter was not breathing and the trachea tube had been removed.

Given the defendant's commitment to this sequence of events and its timing, the defense made specific pretrial discovery requests for any evidence indicating time of death. The prosecutor deliberately failed to disclose that the daughter's pediatrician

placed the time of death somewhere between 9:40 p.m. the previous evening and 3:50 a.m. on the date of death.

On appeal of the defendant's convictions for, *inter alia*, second-degree murder, our Court of Appeals held that a prosecutor who has or knows of evidence vital to the case and who deliberately misleads defense counsel into believing that no such evidence exists is guilty of prosecutorial misconduct sufficiently serious to trigger a reversal of the defendant's convictions. *Campbell*, 29 Kan. App. 2d at 61-62.

Contrary to Dixon's argument, this case bears little similarity to *Lewis* and *Campbell*. First, there was no nefarious conduct by the prosecutor in this case, a lynchpin for the reversals in *Lewis* and *Campbell*. There is nothing in the record on appeal to dispute the State's assertion that it was unaware before Dixon's second trial of Lobdell's modified opinion concerning the position of the stove at the time of the blast.

Moreover, unlike the situations in *Lewis* and *Campbell*, the discrepancy in the expert's testimony in this case was relatively minor. The two versions of Lobdell's testimony were not irreconcilable, as the district judge noted. The opinion drawn out at the second trial was merely an expanded—and somewhat weakened—version of the first opinion. At the first trial, Lobdell said that the stove was upright. In this trial, he said it could have either been upright or on its side. This situation is clearly distinguishable from those in *Lewis*, where the information was the opposite from that expected, and in *Campbell*, where the defense had been led to believe that information introduced by the State did not exist. Indeed, to the extent Lobdell's modification injected uncertainty into his analysis, that uncertainty undercut the State, not the defense.

Dixon also fails to acknowledge that the nature of the discrepancy here could not reach the level of obvious prejudice present in *Lewis* and *Campbell*. Those cases involved testimony that was absolutely critical to the defense. Here, the State's expert, Gomez, and the expert consulted by the defense in the case all opined the stove could have been on its side or upright. There was a great deal of inconsistency on this point, even without Lobdell's change. The defense could not have been surprised by this view of the

evidence. In addition, Lobdell and Gomez consistently agreed that the explosion was fueled by natural gas leaking from a fracture or break in the supply pipe. If the jury agreed with this, then it mattered little whether the stove was upright or on its side as a result of the second break-in. No participant other than Dixon was identified as touching the stove; each of the three other individuals involved in the crimes confirmed that they heard, saw, or learned that Dixon had "shoved," "kicked," "pushed," or "pulled . . . out" the stove.

Given all of the above, we hold that the district judge did not abuse his discretion in denying Dixon's motion for mistrial based on Lobdell's testimony.

### Mistrial for Jury Knowledge of Shackles

Dixon invokes federal and state precedent to support his argument that a mistrial was required because a juror viewed him in leg restraints. See *Deck*, 544 U.S. at 635; *State v. Ninci*, 262 Kan. 21, 53-54, 936 P.2d 1364 (1997).

Quoting *Holbrook v. Flynn*, 475 U.S. 560, 568, 570, 89 L. Ed. 2d 525, 106 S. Ct. 1340 (1986), the United States Supreme Court in *Deck* stated that "shackling is 'inherently prejudicial.' " 544 U.S. at 635. Defendant Carman Deck had been convicted of first-degree murder, and related offenses, and had been sentenced to death. After Deck's postconviction relief motion resulted in a remand for resentencing, Deck was restrained by leg irons, handcuffs, and a belly chain during the second penalty proceeding. The death penalty was again imposed; the Supreme Court of Missouri affirmed; and the United States Supreme Court granted certiorari.

The Supreme Court held that due process prohibits routine use of physical restraints visible to a jury during the guilt phase of criminal trial, 544 U.S. at 626-29; courts also may not routinely place defendants in visible restraints during the penalty phase of capital proceedings. 544 U.S. at 632-33. Deck's shackling was not shown to be specifically justified by circumstances and thus offended due process. The Court stated that no showing of prejudice was required to make out a due process violation from routine use of visible shackles. 544 U.S. at 634-35.

"[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' [Citation omitted.]" 544 U.S. at 635.

This court has had several occasions to address shackling of criminal defendants in trial and similar issues.

In our most recent case, *State v. Powell*, 274 Kan. 618, Syl., 56 P.3d 189 (2002), this court upheld the decision of a district judge to permit defendant Richard Powell to wear a stun belt during the evidence phase of his capital murder trial. The use of the belt was not shown to have been a factor in Powell's decision not to testify; and, while in custody pursuant to his conviction in a prior case for involuntary manslaughter, Powell had stabbed another inmate, kept a shank in his shampoo bottle, and been the last individual to leave the jail's gymnasium before a shank was found there.

In *State v. Davidson*, 264 Kan. 44, Syl. ¶¶ 2-3, 954 P.2d 702 (1998), this court held that it was error for the district judge to tell the jury that the sheriff's purpose for using a leg brace such as that used on the defendant was to prevent escape. However, this court held the error harmless.

In *Ninci*, 262 Kan. at 53, this court noted the holdings of other courts that a defendant generally has a right to appear before a jury free of shackles or other restraints, because such restraints present an unacceptable risk of prejudicial effect. See *Holbrook*, 475 U.S. at 570; *Kennedy v. Cardwell*, 487 F.2d 101, 104-08 (6th Cir. 1973) (shackling, as last resort, not abuse of discretion in circumstances before court), *cert. denied* 416 U.S. 959 (1974); *United States v. Samuel*, 431 F.2d 610, 614-15 (4th Cir. 1970), *cert. denied* 401 U.S. 946 (1971). Defendant Michael D. Ninci argued that a leg brace he was compelled to wear compromised his presumption of innocence and denied him a fair trial. Observing first that Ninci must carry a burden to show prejudicial error, this court stated:

"Ninci presented no evidence that the jury knew he was wearing a leg brace, or that the jury detected his slight limp, or that the jury knew his limp was caused by a leg brace, or that the jury knew the leg brace was on for restraint reasons instead of for medical reasons." *Ninci*, 262 Kan. at 53-54.

Because the restraint was so unobtrusive and it was not clear the jury noticed it, it was not inherently prejudicial, and there was no abuse of discretion in allowing the brace to be worn. 262 Kan. at 53-54.

In *State v. Cahill*, 252 Kan. 309, 314-16, 845 P.2d 624 (1993), this court held that a defendant's right to fair trial was not violated when the district judge denied his motion to excuse the jury panel on the ground that, *inter alia*, some jurors may have seen him in shackles immediately before he was brought into the courtroom.

In *State v. Alexander*, 240 Kan. 273, 275-76, 729 P.2d 1126 (1986), defendant Donald Eugene Alexander cited *Estelle v. Williams*, 425 U.S. 501, 48 L. Ed. 2d 126, 96 S. Ct. 1691, *reh. denied* 426 U.S. 954 (1976), to support his argument that it was error to allow testimony about him residing in jail. In *Estelle*, a lower court had denied the defendant's request for civilian clothes rather than jail garb to wear to court. The United States Supreme Court ruled that, consistent with the Fourteenth Amendment to the United States Constitution, the State could not compel an accused to wear identifiable prison clothes during jury trial; however, because the defendant did not timely object, there was no compulsion and no error. 425 U.S. at 512-13. This court noted in *Alexander*:

"Kansas has addressed the issue of a defendant wearing prison clothes during his jury trial and has ruled that a defendant's appearance in prison clothes does not in and of itself constitute reversible error, that prejudice to the defendant must be shown. [Citations omitted.]

"Other jurisdictions have held where the defendant is seen in shackles, handcuffs, or prison clothes by the jury, such error was harmless error in light of the evidence presented of defendant's guilt. [Citations omitted.]" 240 Kan. at 275.

In *State v. Williams*, 228 Kan. 723, Syl. ¶¶ 7-9, 621 P.2d 423 (1980), this court upheld a district judge's carefully considered decision to shackle a defendant during trial because the defendant had broken a glass door and a window after trial commenced.

"Generally, 'the rule is that freedom from handcuffs during the trial of a criminal case is an important component of a fair and impartial trial.' *State v. Yurk*, 203 Kan. 629, 631, 456 P.2d 11 (1969). Freedom from shackles during trial is the norm and a defendant in a criminal case should not be tried while in handcuffs, leg irons, or other shackles except in unusual, compelling, and exceptional circumstances. Where shackles or physical restraints are employed, the record should

clearly reflect the reason why restraints are ordered. Ordinarily, if the record does not show disruption of trial or other obvious reasons, the trial court should hold a hearing, preserve the evidence by means of the record, and state the reasons for ordering the restraint. See *State v. Stewart*, 276 N.W.2d 51 (Minn. 1979); *People v. Duran*, 16 Cal. 3d 282, 127 Cal. Rptr. 618, 545 P.2d 1322 (1976); and Annot., 90 A.L.R.3d 17, § 11. When exceptional circumstances are present and the trial judge has substantial reason to believe that the defendant, if not physically restrained, will harm himself or others in attendance at trial, or will be so disruptive as to prevent the trial from proceeding, the judge in his discretion may order the minimum restraints necessary. We emphasize that circumstances justifying the use of shackles, handcuffs or other physical restraints on the defendant during trial are extremely rare. Trial courts should order restraints only when it becomes apparent that other means will not be effective." *Williams*, 228 Kan. at 730-31.

In *Yurk*, this court recognized that a defendant's freedom from handcuffs during a criminal trial is an important component of fairness, yet defendant Franklin R. Yurk's motion for mistrial, predicated on the handcuffs he wore in the hallway of the courthouse while being transported from the jail to the courtroom was properly overruled. In that case, it was not claimed that Yurk was forced to appear in handcuffs in the courtroom or before the jury, and there was no showing that any juror saw him in handcuffs during transport. *Yurk*, 203 Kan. at 631.

Even if the United States Supreme Court's decision in *Deck* has recalibrated the test to be applied when we examine a due process challenge to courtroom shackling of a criminal defendant—demanding the State demonstrate lack of prejudice flowing from the practice rather than the defendant demonstrating its presence—we are not compelled to rule for Dixon on this issue.

First, as in *Cahill* and *Yurk*, the record demonstrates that Dixon was never forced to wear shackles in the courtroom. Rather, he evidently was restrained in the courthouse hallway. Shackling of a defendant while in transit through a public hallway is entirely different from shackling at the defense table during a jury trial. We think it highly unlikely that any juror in a double homicide case would be shocked or, for that matter, improperly influenced merely because the accused is transported securely. Any *Deck* recalibration of the prejudice burden or standard is therefore inapplicable.

Further, Dixon can demonstrate no prejudice here, certainly none sufficient to justify our reversal of the district judge's denial of Dixon's motion for mistrial for abuse of discretion. The record demonstrates that the juror questioned by the court may actually have seen nothing at all. Rather, the juror momentarily heard what he believed to be shackles. He then described what he had heard to three other jurors. The juror who heard the shackles denied that the experience would affect his impartial decision making. Although it would have been reassuring for the district judge to have questioned the other jurors, it was not absolutely necessary here. The judge's specific curative admonishment to the entire jury was an excellent alternative to ameliorate any ill effect from a relatively minor incident.

### Lesser Included Offenses

Dixon next argues that the district court erred in failing to give his requested instructions on second-degree murder (a killing "committed unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life") and involuntary manslaughter (unintentional killing committed recklessly) as lesser included offenses of felony murder.

When murder is committed during the commission of a felony, the ordinary rule requiring instructions on lesser included offenses does not apply. *State v. Branning*, 271 Kan. 877, 887, 26 P.3d 673 (2001). In a felony-murder case, a district judge is not required to instruct on lesser included offenses unless the evidence of the underlying felony is weak or inconclusive. 271 Kan. at 887. In other words, instructions on lesser included offenses are not appropriate in those cases in which the evidence of the underlying felony is strong. *State v. Oliver*, 280 Kan. 681, 703-06, 124 P.3d 493 (2005), *cert. denied* 547 U.S. 1183 (2006).

We note as a preliminary matter that a similar claim of error was decided against Dixon in his first appeal. We concluded that Griffin's testimony "provided substantial and conclusive proof of Dixon's criminal damage to property. And it could reasonably be inferred from the evidence that Dixon entered the apartment with the felonious intent to criminally damage property. No lesser offense instructions were required." *Dixon I*, 279 Kan. at 572; see

also 279 Kan. at 604 (ruling evidence of intent to commit theft on second entry sufficient). But our previous decision is not dispositive on this issue now. Portions of Griffin's testimony from Dixon's first trial were used to refresh Griffin's recollection or to impeach him in the second trial. Griffin was designated as hostile to the State during the second trial; although the evidence elicited from him was not substantially different from that elicited before, it was by no means identical. The defense is correct that the testimony of both Griffin and Jerry Hall, another of Dixon's accomplices, was arguably less damning the second time around. We must therefore consider anew whether the evidence in Dixon's second trial merited lesser included instructions on second-degree murder and involuntary manslaughter.

In this case, the felony-murder convictions were based on the underlying felony of the second burglary. This court has consistently held that a defendant need not be prosecuted for or convicted of an underlying felony in order to be convicted of felony murder. See K.S.A. 21-3401(b); *State v. Herron*, 286 Kan. 959, 189 P.3d 1173 (2008); *Dixon I*, 279 Kan. at 571; *cf. State v. Engelhardt*, 280 Kan. 113, 133, 119 P.3d 1148 (2005) (although accused not required to be charged with, prosecuted for, or convicted of underlying felony to be convicted of felony murder, jury must be instructed on underlying felony). Here, Dixon was convicted of the second burglary, which he challenges on other grounds detailed in subsequent sections of this opinion.

On this issue, he asserts that the evidence of the second burglary was weak or inconclusive because the State's proof of his intention to commit any of the three alternative predicate felonies—aggravated arson, criminal damage to property, and theft—for the burglary based on the second time he entered Shaw's apartment was inadequate. This court must determine whether substantial evidence supports each alternative means to commit that burglary, that is, whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt. *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994). If so, the evidence of the underlying felony of burglary was not weak or inconclusive.

Although Dixon testified in his second trial and stated that he did not return to the apartment a second time, the weight of evidence—direct and circumstantial—stood against him.

Rodney Hayes, Griffin, and Hall testified that, after the first break-in during which they stole a television, a video-recorder, a lamp, and a jewelry box, Dixon returned to Shaw's apartment with Griffin and entered it a second time. Griffin testified that on this second trip, Dixon threw a candle at a television, tore curtains off a window, "tore up" the living room, trashed the kitchen, and "kicked" or "pushed" the stove. Hayes testified that he knew Dixon and Griffin had gone back to the apartment, and, the next day as the group traveled home, Griffin told Hayes that Dixon had gone "crazy, grabbing everything he could get his hands on, throwing stuff around, breaking it," that he "tried to throw something through the front window," and that he had "grabbed" or "pulled" the stove and "a pipe started hissing, seeping gas." Hall testified that he heard after the fact that Dixon and Griffin had gone back to the apartment and that Dixon had "pulled the stove out."

Shaw testified that Dixon was angry with her sister for leaving him, that he was trying to find her and her sister the night of the crimes, that the women had lied about being in Emporia when they were actually in Topeka, that Dixon had called her and her sister 108 times during that night, that Dixon called on her cell phone from her apartment at 6 a.m., that she woke up later that morning to news of the explosion, and that she immediately suspected Dixon.

Bickerstaff, with whom Shaw and her sister had spent the night, corroborated Shaw's testimony, saying she heard Dixon say, "I'm tired of playing games. I'm sick of playing games. Watch the news tomorrow. Everybody's shit's going up in flames."

Ample evidence at the second trial also demonstrated that, after the first break-in, Dixon drove to a gas station and Griffin pumped $1.60 worth of gasoline into a bucket and put it inside Dixon's Suburban. Dixon testified that he had no idea Griffin would put gas in the bucket and that, when he asked why it was in his truck, Hayes explained it would dissolve cocaine if the group was stopped by police. In contrast, Hayes, Griffin, and Hall testified that they

obtained the gasoline at Dixon's direction and did not know its intended use. They complained about the smell of the gasoline and its sloshing out of the bucket, and that they could not smoke with it in the vehicle. Griffin testified that he heard Dixon say, "I'll burn it up"; but ultimately he told the others to throw the gasoline out, which they did.

Terry Jones, Dixon's cellmate, testified that he believed Dixon was arguing with his girlfriend and intended to burn a house. Other evidence established that Dixon had told several different stories to the police and that he tried to bribe two eventual jailhouse informants to testify to a fictional account of events.

Our comprehensive review of the evidence at Dixon's second trial persuades us that the proof of each of the three alternative predicate felonies for the second burglary, which in turn underlay the felony-murder charges, was sufficient to eliminate the requirement for the lesser included instructions Dixon sought. Dixon's intent upon the second entry to commit aggravated arson was evidenced by the purchase of gasoline and the comments about "burning up" the place and property "going up in flames," even though he was ultimately acquitted on the aggravated arson count. His intent to commit criminal damage to property was supported by Griffin's testimony and the substantial additional damage that occurred during the second trip to the apartment. His intent to commit theft, while less clear in relation to the second break-in, could, as we held in his first appeal, reasonably be inferred from the theft that occurred during the first burglary. *Dixon I*, 279 Kan. at 604.

"The nonexistence of direct evidence of defendant's intent does not end the inquiry. Intent, a state of mind existing at the time the offense is committed, does not need to be and rarely can be directly proven. It may be established by acts and circumstances and inferences reasonably deducible from evidence of acts and circumstances." 279 Kan. at 604 (citing *State v. Wilkins*, 269 Kan. 256, 264-68, 7 P.3d 252 [2000]).

The second jury, we note, did convict Dixon on the first burglary as well as the second. Dixon is not entitled to reversal on this lesser included instruction issue.

## Unanimity Instruction

Dixon also asserts that he was entitled to a unanimity instruction on the predicate felony for the second burglary, which supported the felony-murder charges. As discussed with regard to the previous issue, the jury was allowed to consider Dixon's intent to commit the alternative predicate felonies of aggravated arson, criminal damage to property, and theft.

" 'In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]

" 'In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all [jurors] must agree that the same underlying criminal act has been proved beyond a reasonable doubt. [Citations omitted.]' " *Timley*, 255 Kan. at 289-90.

This is clearly an alternative means rather than a multiple acts case. Having already decided that the evidence of each of the alternative means of committing the second burglary was adequate, we conclude that Dixon's unanimity instruction argument is without merit. See *State v. Griffin*, 279 Kan. 634, 662-63, 112 P.3d 862 (2005). We are not inclined to abandon the valid legal and practical distinctions between these types of cases. We also note that Dixon does not challenge the sufficiency of the evidence supporting the alternative predicate felonies for the first burglary, as he did regarding aggravated arson after his first trial.

## Burglary Elements Instruction

Dixon next argues that the jury was not properly instructed on the intent necessary to find him guilty of the second burglary and, thus, the felony murders it supported. Specifically, Dixon contends that the instructions did not tell the jury what makes criminal dam-

age to property, one of the alternative predicate felonies for the burglary, a felony rather than a misdemeanor.

Under the law governing this case, criminal damage to property was a felony only if the value of the damage was more than $500 but less than $25,000. See K.S.A. 21-3720 (Furse 1995). The burglary elements instruction did not include the dollar amounts for criminal damage to property, but the criminal damage to property elements instruction did include the correct amounts. The jury got no other definition of criminal damage to property and entered a special verdict, finding that Dixon caused at least $500 but less than $25,000 damage. The jury was not asked to and did not make a particular finding on whether Dixon intended to do felony-level criminal damage to property upon each entry into Shaw's apartment.

This court has often stated that jury instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case and the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. *State v. Hunt*, 257 Kan. 388, 392, 894 P.2d 178 (1995); see *State v. Butler*, 257 Kan. 1043, 1065, 897 P.2d 1007 (1995). Errors that do not affirmatively prejudice the substantial rights of a complaining party do not require reversal if substantial justice has been done. *State v. Holbrook*, 261 Kan. 635, 636-37, 932 P.2d 958 (1997); *State v. Johnson*, 255 Kan. 140, 148, 871 P.2d 1246 (1994).

On pattern instructions, we have said:

" ' "The use of PIK instructions is not mandatory, but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." ' [Citations omitted.]" *Holbrook*, 261 Kan. at 637.

Instructions Nos. 14 and 17, consistent with PIK Crim. 3d 56.02, set out the elements for felony murder, *i.e.*, a killing "done while

in the commission of, attempting to commit, or in flight from a burglary," and stated the elements of burglary as:

"1. That [Dixon] knowingly entered or remained in a building which is a dwelling;
"2. That [Dixon] did so without authority;
"3. That [Dixon] did so with the intent to commit a theft, and/or aggravated arson, a felony, and/or criminal damage to property, a felony, therein; and
"4. That this act occurred on or about the 29th day of July, 2001 in Lyon County, Kansas."

Instruction No. 24, in accord with PIK Crim. 3d 59.17, again set out the elements for a burglary, defining it exactly as it had been defined in Instructions Nos. 14 and 17 and again listing the three possible felonies Dixon could have intended to commit on entry. It also directed the jury to Instructions Nos. 18, 25, and 26 for the three alternative predicate felonies for the second burglary.

Instruction No. 26, in accord with PIK Crim. 3d 59.23 and PIK Crim. 3d 59.70, set out the elements of only felony criminal damage to property:

"1. That Eastgate Plaza, Inc., was the owner of property described as Eastgate Plaza Apartments, 707 B; that [Shaw] had an interest as a renter in property located in the residence described as Apartment 707 B of Eastgate Plaza Apartments;
"2. That [Dixon] intentionally damaged, destroyed, or substantially impaired the use of the property owned by [Shaw] and/or Eastgate Plaza, Inc., by means other than by fire or explosion;
"3. That [Dixon] did so without the consent of [Shaw] and Eastgate Plaza, Inc.;
"4. That the property was damaged to the extent of at least $500 but less than $25,000; and
"5. That this act occurred on or about the 29th day of July, 2001 in Lyon County, Kansas."

These instructions were given in accord with the pattern instructions. Read together, they fairly and accurately state the law, and there was no possibility that this jury could have been misled. The only definition of criminal damage to property given to the jury was the definition of felony criminal damage to property. A jury cannot be presumed to have legal knowledge outside the statements of law in the instructions. This jury was plainly instructed that Dixon was guilty of burglary if he entered the apartment with the intent to commit criminal damage to property as defined. The

burglary instruction referred the jury to the instruction setting out the elements of felony criminal damage to property, including the necessary value of the property. The jury unanimously found Dixon guilty of felony criminal damage to property, and its special verdict form indicated that it found the property damaged was valued at least $500 but less than $25,000. A further refinement of the instructions or the verdict form was not necessary to protect Dixon's rights.

### Admission of Evidence Regarding Defendant's Mother

Dixon properly objected to admission of testimony about his mother's offer to replace Shaw's property in exchange for Shaw's silence about her suspicions regarding Dixon. He contends the testimony was irrelevant and unduly prejudicial.

Dixon asks this court to review the admission of this evidence de novo, because the district judge failed to state his rationale for the admission. The State maintains that the admission decision should be reviewed only for abuse of discretion. This court has stated many times in the past that it reviews the admission or exclusion of evidence under an abuse of discretion standard. See, e.g., *State v. Jenkins*, 272 Kan. 1366, 1378, 39 P.3d 47 (2002); *State v. Wagner*, 248 Kan. 240, 243, 807 P.2d 139 (1991). But we have recently clarified this standard of review, reaffirming relevance as the first consideration of a district judge. See K.S.A. 60-407(f); *State v. Engelhardt*, 280 Kan. 113, 126, 119 P.3d 1148 (2005); *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004); *State v. Bloom*, 273 Kan. 291, 303, 44 P.3d 305 (2002). Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. *Carter*, 278 Kan. at 77. *State v. Lumley*, 266 Kan. 939, 950-51, 976 P.2d 486 (1999).

"The concept of relevance under Kansas law includes both whether evidence is probative and whether it is material. On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard." *State v. Vasquez*, 287 Kan. 40, Syl. ¶ 3, 194 P.3d 563 (2008).

See *State v. Reid*, 286 Kan. 494, 503-09, 186 P.3d 713 (2008).

Furthermore, " '[o]nce relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question.' " *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006) (quoting *Carter*, 278 Kan. at 77). If the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, this court reviews the decision de novo. *Gunby*, 282 Kan. at 47-48.

If the record in this case showed only that Dixon's mother spontaneously called Shaw and offered to replace the items in Shaw's apartment that were damaged or destroyed and that the call had nothing to do with Dixon, then we would agree that testimony about the call tested the limits of both the abuse of discretion probative value standard and the de novo materiality standard encompassed by the concept of relevance under Kansas law. But that is not what the record shows. Dixon's mother's call was not spontaneous; it was prompted by Dixon's telephone conversation with Shaw and her accusation of him, followed by Dixon's telephone conversation with his mother. The record also shows the call may have had everything else to do with Dixon as well; he not only hoped his mother could speak more calmly with Shaw but, Shaw testified, the mother's offer was expressly conditioned on Shaw keeping her suspicions of Dixon to herself. The conversation and its timing and content were, as a matter of law, material to Dixon's possible consciousness of guilt and attempt at a coverup. Further, it was not an abuse of discretion for the district judge to decide that the web of telephone conversations was probative on these material considerations.

We also do not regard the admission of this evidence as *unduly* prejudicial. See *State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997). It certainly tended to inculpate Dixon rather than exculpate him, but, given the largely consistent stories of his three accomplices about Dixon's leadership role in the burglaries and other crimes and from others about his motives, it is simply impossible that any juror's vote on guilt turned on Dixon's mother's evidently misguided or malign effort to help her son.

### Cumulative Error

Dixon's last challenge in this appeal is based on his assertion that cumulative error cost him a fair trial. Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Cosby*, 285 Kan. 230, Syl. ¶ 9, 169 P.3d 1128 (2007). Moreover, this doctrine does not apply if no error or only one error supports reversal. See *State v. Carter*, 284 Kan. 312, 332, 160 P.3d 457 (2007). Having held there was no error under Dixon's other appellate issues, we do not apply the doctrine here. There was no cumulative error.

Affirmed.

DAVIS, NUSS, and LUCKERT, JJ., not participating.

GREENE, HILL, and LEBEN, JJ., assigned.